■ HILARY RAMPE, an Infant, by LINDA RAMPE, Her Mother and Guardian, et al., Respondents, v COMMUNITY GENERAL HOSPITAL OF SULLIVAN COUNTY, Appellant, and RANDOLPH J. COHEN, Respondent. [660 NYS2d 206] —Yesawich Jr., J. Appeal from a judgment of the Supreme Court (Leaman, J.), entered July 29, 1996 in Sullivan County, upon a verdict rendered in favor of plaintiffs against defendant Community General Hospital of Sullivan County.

When plaintiff Linda Rampe, pregnant with her fourth child, began experiencing labor contractions on March 2, 1987, she contacted her obstetrician's office and was directed to go to defendant Community General Hospital of Sullivan County. Upon arriving there, she was placed in a labor room and checked by Kathleen Vetter, an obstetrical nurse, who performed a vaginal examination and attached an external fetal monitor. Vetter testified that she telephoned defendant Randolph J. Cohen, the obstetrician, at approximately 5:15 P.M., informed him that Rampe was in labor and was directed by Cohen to admit Rampe.

At approximately 5:40 P.M. Vetter observed a deceleration in the fetal heart rate, which she perceived to be a "late" deceleration, an indication that the fetus may not be receiving enough

oxygen. The hospital record shows, and Vetter confirmed upon her review of the same, that Cohen was again contacted and informed of the "variable, late decel[erations]". Cohen apparently directed Vetter, at that time, to place Rampe on her side and begin administering oxygen, and these orders were carried out.

Cohen arrived at the hospital at approximately 6:40 P.M., checked the monitor strips, and found nothing that he considered troubling, or suggestive of fetal distress. He ruptured Rampe's membranes at 6:52 P.M., observed meconium in the amniotic fluid—which is not uncommon, but can be a sign of fetal distress—and attached an internal fetal monitor. When the first readings from that device showed a prolonged deceleration, Cohen decided, in view of the relatively slow rate at which Rampe's labor had progressed, the meconium-stained fluid and the deceleration he had observed after the membranes were ruptured, that it would be prudent to deliver the baby by Cesarean section. A surgical team was called and Rampe was prepared for surgery, but at approximately 8:00 P.M., as she was being taken to the operating room, it became apparent that her labor had progressed to the point where the birth was imminent. Rampe was then taken to a birthing room, where her daughter, plaintiff Hilary Rampe, was delivered at 8:19 P.M.

Shortly thereafter, it was discovered that Hilary suffered from meconium aspiration syndrome, a condition in which the lungs have been damaged by exposure to meconium that has been aspirated before or immediately after birth. Although Hilary was able to benefit from a relatively new procedure, which apparently enabled her lungs to make a full recovery, she required extraordinary care, including tube feeding, for several months. In addition, the procedure increased her risk of suffering from certain serious health problems, including stroke, in the future, and left her with a scar at the base of her neck.

Plaintiffs commenced this medical malpractice action against Cohen and the hospital,* contending that they were negligent in, *inter alia*, failing to timely order and perform a Cesarean section. After trial, the jury found Cohen and the hospital each 50% at fault for plaintiffs' injuries, and awarded a total of $328,000 in compensatory damages. Supreme Court granted Cohen's posttrial motion for judgment notwithstanding the verdict, but denied a similar motion made by the hospital, finding sufficient evidence to justify concluding that Vetter had

---

* One of Hilary's pediatricians was also named as a defendant, but all causes of action against him were withdrawn at trial.

been negligent in failing to contact Cohen after 5:45 P.M. to notify him of further changes in the fetal heart rate that occurred prior to his arrival. The hospital appeals.

There is merit in the hospital's argument. The record evidence, viewed in the light most favorable to plaintiffs, as it must be at this juncture (*see, Barker v Bice*, 87 AD2d 908), provides ample support for the proposition that Vetter breached the applicable standards of reasonable medical conduct by not attempting to inform Cohen that decelerations continued to occur; plaintiffs also established that an earlier birth may have decreased the likelihood that Hilary would aspirate meconium. There is, however, no proof that an additional phone call to Cohen would have prompted him to order a Cesarean section prior to 7:00 P.M., such that Hilary would have been born sooner than she was (plaintiffs posited no other means by which her injuries might have been prevented or lessened). Absent some basis for concluding that Vetter's negligence was a proximate cause of Hilary's injuries, the verdict against the hospital cannot stand (*see, Gayle v Neyman*, 91 AD2d 75, 80; *Foley v Gillick*, 39 AD2d 546, 547, *lv denied* 31 NY2d 643; *Vara v Drago*, 24 AD2d 888, 889).

In support of their assertion that an additional phone call would have caused Cohen to act with greater celerity, plaintiffs rely on their expert's testimony that, if the physician had been called at 6:00 P.M., "he could have instructed the nurses to call the team", to prepare for a surgical delivery, or "[h]e could have rushed to the hospital, gotten there sooner, and * * * the baby could have been delivered by 7 o'clock". There is, however, no indication that Cohen would, in fact, have done either of these things. Vetter testified, and the record confirms, that Cohen *had* been made aware that there had been "late" decelerations at or before 5:55 P.M.; yet, he did not order that a surgical team be assembled at that time. There is simply no basis— aside from rank speculation—for concluding that another phone call would have caused him to do so. Significantly, his own testimony reflects that he did not consider the type of fetal heart rate decelerations that were observed, without more, as denoting a need for surgical intervention.

Even assuming, arguendo, that an additional call might have spurred Cohen to attempt to reach the hospital more quickly, and assuming further that he could have gotten there earlier than 6:40 P.M. (neither of these things having been proven), there is no proof that he would have ordered a Cesarean section sooner than he did. Cohen's own conclusion, after reviewing the monitor recordings made prior to his arrival at 6:40

P.M., was that they presented no cause for concern; rather, he testified, it was the combination of the decelerations (particularly the prolonged one that occurred at approximately 7:03 P.M.), the meconium-stained fluid and the relatively slow progress of Rampe's labor during her first hour and a half at the hospital that prompted him to decide that a Cesarean section was warranted. Nothing in the record establishes that these three factors would have all been present at any earlier time, or that Cohen would have decided to intervene absent any of the three. Even accepting, for purposes of argument, that he would have ruptured Rampe's membranes immediately upon his arrival, whenever that may have been, and that he would have found meconium and installed the internal monitor at that time, it is not evident that the prolonged deceleration would have occurred then (there was no testimony to this effect). And even if it did, one can only speculate as to whether Cohen would have ordered a Cesarean section at that time or continued to wait to see how Rampe's labor would progress.

There being no factual support for the expert's ultimate opinion as to causation (see, Cooke v Bernstein, 45 AD2d 497, 500), and no other proof that Vetter's failure to place another call to Cohen had any impact on the timing of his eventual decision to call for a Cesarean section, there is simply "no valid line of reasoning * * * [that] could possibly lead * * * to the conclusion" (Cohen v Hallmark Cards, 45 NY2d 493, 499) that Vetter's actions were a substantial factor contributing to the cause, or severity, of Hilary's injuries. Consequently, the hospital's posttrial motion for judgment notwithstanding the verdict should have been granted.

Mikoll, J. P., Mercure, Crew III and Peters, JJ., concur. Ordered that the judgment is modified, on the law and the facts, without costs, by reversing so much thereof as denied defendant Community General Hospital of Sullivan County's motion for judgment notwithstanding the verdict; said motion granted and complaint dismissed against said defendant; and, as so modified, affirmed.