■ Stephen Cramer, as Administrator of the Estate of William E. Cramer, Deceased, Respondent, v Benedictine Hospital, Defendant and Third-Party Plaintiff-Appellant. Alexander Matas et al., Third-Party Defendants-Respondents. [754 NYS2d 414] —Kane, J. Appeals (1) from an order of the Supreme Court (Bradley, J.), entered September 14, 2001 in Ulster County, which granted plaintiff's motion to sever the third-party action, (2) from a judgment of said court (Kavanagh, J.), entered April 24, 2002 in Ulster County, upon a verdict rendered in favor of plaintiff, and (3) from an order of said court, entered April 5, 2002 in Ulster County, which denied defendant's motion to set aside the verdict.

On April 1, 1995, William E. Cramer (hereinafter decedent),

a profoundly retarded 30-year-old male who resided in a group home, was taken by ambulance to defendant's emergency room in the City of Kingston, Ulster County, after allegedly choking on a corn cob that he swallowed, which he had managed to grab from the kitchen garbage. Decedent arrived at the emergency room, "drooling, [and] spitting large amounts of fluid and saliva" and was seen and examined by third-party defendant Alexander Matas. After several unsuccessful attempts to obtain a gastrointestinal consult, third-party defendant Govind P. Chaturvedi, an ear, nose and throat specialist, examined decedent. Chest X rays were taken and decedent was given a barium swallow (esophagram).[1] Matas examined the results of the esophagram, but found "no obstruction." Although a radiologist was on call that evening, he was not contacted to read decedent's X ray.

Several hours later, decedent was still "spitting up fluids," but nevertheless was discharged home. The discharge orders contained instructions for a liquid and soft food diet for decedent for two to three days and directed that he be seen by his own physician. Decedent was to return to the emergency room if new symptoms developed or if the condition worsened and decedent's doctor could not be reached. The discharge instructions further noted that a final reading of decedent's X rays would be made the next morning and he would be notified of any discrepancy, if found. Upon reading the X rays the following morning, the radiologist agreed with the preliminary interpretation of "no obstruction," but suggested the possibility of a nonobstructing foreign body in the distal esophagus. However, no one at decedent's group home was called with these results.

On April 5, 1995, decedent was admitted to defendant hospital with complaints of lethargy, vomiting and abdominal pain. On April 6, 1995, decedent underwent an exploratory laparotomy revealing perforation of the distal end of the small bowel, believed to be caused by a chicken bone located near the perforation. The hole in the intestine caused fecal contamination which ultimately led to multiple organ failure. Decedent lapsed into a coma from April 6, 1995 until April 11, 1995, at which point he became alert until lapsing back into a coma five days later. He died April 17, 1995.

Plaintiff commenced this medical malpractice action on April 16, 1997, alleging that defendant was negligent in the care and

---

1. An esophagram is designed to detect the presence of foreign objects in the esophagus through the ingestion of a contrast medium consisting of barium sulfate.

treatment of decedent. Defendant waited to commence the third-party action against Matas, Chaturvedi and third-party defendant Peter Bang[2] until December 2000, approximately six weeks after the note of issue and certificate of readiness had been filed. At a January 2, 2001 pretrial conference, a trial date was scheduled for October 15, 2001. By order dated September 11, 2001, Supreme Court granted plaintiff's application to sever the third-party action.[3] Following a trial of the main action, the jury found defendant liable for medical malpractice and awarded decedent's estate $1 million for decedent's pain and suffering. Defendant's motion to set aside the verdict was denied. Defendant appeals from Supreme Court's order severing the third-party action, from the jury verdict in favor of plaintiff, and from Supreme Court's denial of its motion to set aside the verdict.

Initially, we reject defendant's argument that Supreme Court erred in granting a severance. "Severance, under CPLR 603, is a matter of judicial discretion which will not be disturbed on appeal absent an abuse of discretion or prejudice to a substantial right of the party seeking severance" (*Finning v Niagara Mohawk Power Corp.*, 281 AD2d 844, 844 [citations omitted]). Defendant was dilatory in waiting more than three years to commence the third-party action since it had long been aware of the identities of the third-party defendants and the factual underpinnings to its claim that plaintiff's injuries resulted from the alleged negligent care rendered by third-party defendants. Once the third-party action was commenced, defendant was less than diligent in pursuing discovery and scheduling depositions. In fact, it appears that no fixed date had been established for depositions in the third-party action as of September 11, 2001. Generally, the interest of judicial economy would be best served by having a single trial of the main action and the third-party action as they share, inter alia, common principles of law and fact. However, defendant's argument favoring a single trial is greatly eviscerated by the fact that defendant did not immediately perfect an appeal from the order granting severance nor seek a stay of the pending trial, but rather waited until *after* the trial was held to perfect its appeal from that order. Under these facts, notwithstanding that the negligence claim against defendant and the indemnification claim against third-party defendants involve common legal principles and facts arising out of the care and treatment

2. Bang was the emergency room physician on duty at defendant hospital on April 2, 1995.

3. Third-party defendants joined in this application for severance.

of decedent, we find that severance was not an abuse of discretion.

Next, we reject defendant's contention that the disclosure by plaintiff's counsel of certain inadmissible hearsay material from a Department of Health (hereinafter DOH) report warrants reversal. During the trial, a redacted DOH report was entered into evidence.[4] Initially, with regard to plaintiff's argument that the DOH report should have been admitted in its entirety, we note that, under the circumstances herein, the opinions and conclusions of DOH stated in the report are inadmissible (*see* Public Health Law § 10 [2]; *Maldonado v Cotter*, 256 AD2d 1073, 1075). Defendant challenges Supreme Court's failure to exclude certain portions of the DOH report based on lack of probative value and potential prejudicial impact. Defendant objects to, inter alia, a section in the report in which it is claimed that nursing documentation was inadequate. Given that plaintiff's expert testified that the alleged medical deficiencies reflected in the factual statements of the DOH report were not causally related to decedent's death, admission of these statements is harmless error. In addition, it cannot be said that the jury inferred that defendant was negligent based only on these allegedly irrelevant statements, as the record indicates that there was ample properly admitted evidence on which the jury could base its finding (*see generally Laguesse v Storytown U.S.A.*, 296 AD2d 798, 800-801).

Defendant also challenges two occasions during the trial when redacted information from the DOH report was made known to the jury. In the first instance, during cross-examination of defendant's medical expert, plaintiff's attorney placed poster-sized enlargements of the DOH report in the jury's view with large areas of the text, which constituted either express or implicit opinions with respect to the issue of malpractice, redacted as ordered inadmissible by Supreme Court. In contravention of Supreme Court's in limine ruling, plaintiff's counsel asked defendant's medical expert the following questions:

"In your review of that [DOH] report did it also say that there was no written policy in place?"

"For a transfer of a discrepancy from the Radiology Department to the Emergency Department at Benedictine Hospital?"

---

4. Prior to trial, defendant made a motion in limine which sought to preclude the DOH report, which details the alleged deficiencies in defendant's care of decedent. Supreme Court determined that portions of the report containing factual recitations were admissible, while other portions which it considered opinions, were inadmissible.

"And they said that that was a departure from accepted care, didn't they?"

Supreme Court sustained defendant's objection and gave a curative instruction, but denied its motion for a mistrial.

Defendant also objected to the request by plaintiff's counsel of its expert witness on direct to read a section of the DOH report which indicated, in part, that a similar episode of failure to communicate an X-ray discrepancy had been reported in regard to the radiologist who had read decedent's X rays. Shortly thereafter, Supreme Court instructed the jury to disregard "anything else that may relate to any other date than what happened on April 1, 1995 and thereafter in connection with the defendant[ ]." After the jury was dismissed, the court stated on the record that it "inadvertently neglected to strike as part of [its] ruling" the portion of the DOH report which referred to the prior episode involving the radiologist. The court also denied defendant's second request for a mistrial.

Here, Supreme Court's acknowledgment of its error, coupled with curative instructions which we find were "sufficient to neutralize the prejudicial effect of the error," obviates the need for reversal (*Dennis v Capital Dist. Transp. Auth.*, 274 AD2d 802, 803), particularly as the radiologist's failure to communicate findings from the radiology department to the emergency department was not the ultimate issue in the case. Here, the jury determined that the failure to communicate the results of the X-ray exam to decedent, a fact not in dispute, was the departure from accepted medical practice. Furthermore, defendant's motions for a mistrial "based upon the erroneous admission of evidence was 'directed to the sound discretion of the trial court' and the giving of sufficient curative instructions will justify the denial of the motion" (*id.* at 803, quoting *Harris v Village of E. Hills*, 41 NY2d 446, 451). From our review of the record, we conclude that the court's immediate and explicit curative instructions in both instances were sufficient to alleviate the prejudicial effect of the error and justified the denial of defendant's motion for a mistrial (*see Dennis v Capital Dist. Transp. Auth., supra* at 803). Thus, reversal is not required on this basis.

With regard to the merits of defendant's contention as to the sufficiency of the evidence, the trial record provides support for the jury's finding of liability. To set aside a verdict and grant judgment as a matter of law, a court must determine "that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented

at trial" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499; *see Campbell v City of Elmira*, 84 NY2d 505, 509). Considering the evidence in the light most favorable to plaintiff, it cannot be said that it was irrational for the jury to conclude that defendant departed from accepted medical practice in diagnosing and treating decedent. It was essential to plaintiff's case that the jury find that the object partially obstructing decedent's esophagus shown in the X ray of April 1, 1995 was the chicken bone found to have pierced his ileum on April 6, 1995. A direct care worker from decedent's group home testified that decedent's dinner on April 1, 1995 consisted of, inter alia, chicken without the bones, and corn on the cob that was approximately two to three inches in length. Although the direct care worker testified that he was directly behind decedent at all times and only saw decedent shove a corn cob into his mouth, he did testify that there were chicken remains, including bones, in the garbage. Defendant's expert opined that, based on its size, estimated by him to be three inches in length and cylindrical in shape, the foreign object observed on the esophagram was a corn cob. A radiologist who testified estimated that the object was 2½ inches long by one-half inch wide. The pathology report measured the chicken bone removed from decedent as 1¼ inches long, one-half inch wide and one-sixteenth inch thick. Plaintiff's expert testified that when a whole piece of chicken is ingested, everything but the chicken bone will get digested. In light of the foregoing, it was not irrational for the jury to conclude that, although the size of the chicken bone that was removed from decedent on April 6, 1995 was smaller than the image on the esophagram, decedent had ingested a piece of chicken that contained both bone and flesh and the flesh had digested while the bone remained.

Given decedent's access to chicken bones in the garbage, the partial obstruction immediately following his ingestion of garbage, the appearance of an object partially obstructing his esophagus of a size and shape of a chicken bone with flesh on it and the appearance of the object in his ileum five days later, leads us to conclude that the jury could find that the object in his esophagus was the object removed on April 6, 1995. Under these circumstances, plaintiff's expert testified that defendant had breached the standard of care for emergency room medicine by failing, inter alia, to have an esophagram read by a radiologist on the evening of April 1, 1995, by failing to have decedent seen by a gastroenterologist and by failing to communicate the discrepancy, and that each of such failures were a cause of decedent's death.

We are also unpersuaded by defendant's alternative argu-

ment that the jury verdict in favor of plaintiff was against the weight of the evidence. Based on our review of the trial record, we cannot conclude that the evidence so preponderated in favor of defendant that the verdict could not have been reached on any fair interpretation of the evidence (*see Grassi v Ulrich*, 87 NY2d 954, 956; *Lolik v Big V Supermarkets*, 86 NY2d 744, 746; *Fridovich v Meinhardt*, 247 AD2d 791, 792). Although defendant presented conflicting expert testimony, "affording due deference to the jury's resolution of that conflict and giving [plaintiff] every favorable inference that can be drawn from the evidence," we find no valid basis for disturbing the jury's verdict (*Fridovich v Meinhardt, supra* at 792).

We do agree, however, with defendant's contention that the damages awarded deviated materially from what would constitute reasonable compensation. It is well recognized that "[t]he amount of compensation to be awarded to an injured person is a question of fact to be resolved by the trier of fact and will only be disturbed when it deviates materially from what would be reasonable compensation" (*Simeon v Urrey*, 278 AD2d 624, 624; *see* CPLR 5501 [c]). To recover damages for pain and suffering, an injured plaintiff must have some level of awareness (*see McDougald v Garber*, 73 NY2d 246, 255). The evidence indicates that decedent experienced moderate discomfort, such as difficulty swallowing, during the period from April 1, 1995 to April 5, 1995. In contrast, the uncontroverted evidence indicates that decedent was in a profound coma from April 6, 1995 to April 11, 1995, and that, in such a state, it would have been difficult for him to have perceived pain. With respect, however, to the period between April 11, 1995 and April 16, 1995, the time during which decedent was alert, the jury could have found that decedent endured significant pain and suffering as a result of severe peritonitis, sepsis, the surgery, edema, skin ulcerations and subsequent organ failure and respiratory problems. On this record, where decedent's pain and suffering was limited to a period of approximately six days, we conclude that an award of $1 million deviates materially from what would be reasonable compensation and should be reduced to $350,000 (*see Morrisseau v State of New York*, 265 AD2d 647, 651; *Dunn v Moss*, 193 AD2d 983, 986; *compare Stedman v Bouillon*, 234 AD2d 876, 879).

Crew III, J.P., Carpinello, Mugglin and Rose, JJ., concur. Ordered that the order entered September 14, 2001, is affirmed, without costs. Ordered that the judgment entered April 24, 2002, and the order entered April 5, 2002, are modified, on the law and the facts, without costs, and a new trial ordered as to

the issue of damages for decedent's conscious pain and suffering only, unless, within 20 days after service of a copy of this decision with notice of entry, plaintiff stipulates to reduce the amount of the award for said damages to $350,000, in which event said judgment and order, as so reduced, are affirmed.