(August 14, 2008)

■ DONNA M. LANG, Respondent-Appellant, v JAMES P. NEWMAN et al., Defendants, and RUSSELL J. FIRMAN, Appellant-Respondent. [862 NYS2d 859]—

Rose, J. Cross appeals (1) from an order of the Supreme Court (Rumsey, J.), entered April 18, 2007 in Cortland County, which, among other things, denied defendant Russell J. Firman's motion to set aside the verdict, and (2) from a judgment of said

court, entered April 23, 2007 in Cortland County, upon a verdict rendered in favor of plaintiff.

Plaintiff commenced this medical malpractice action against, among others, two emergency medicine physicians who treated her at the Cortland Memorial Hospital emergency department on the morning of January 14, 2003. Triage assessment notes from that morning indicate that plaintiff's chief complaint upon arriving at the hospital was numbness in her left hand. She was initially treated by defendant James P. Newman, whose notes report that, in addition to left hand numbness, plaintiff complained of slurred speech, some left facial drooping which he was unable to detect, a headache which developed after her arrival, and decreased sensation to light touch of the left hand and foot. He also noted that plaintiff had a history of migraine headaches. Newman promptly ordered a CT scan of the brain, which did not conclusively rule out a bleeding stroke, and ordered medication shortly before 7:00 A.M. for plaintiff's pain. As of 7:00 A.M., when plaintiff was transferred to the care of defendant Russell J. Firman, Newman had made no definitive diagnosis of her condition.

While under Firman's care, plaintiff complained of continued nausea, significant head pain surrounding her right eye, left hand numbness, an inability to complete sentences and left side weakness. Firman reported that he performed a routine neurologic examination, which included assessing plaintiff's cranial nerves, cerebellar functions, speech, motor strength and sensation, and noted no abnormalities. He then ordered pain medication for her headache. According to medical records and trial testimony, between 9:00 A.M. and 10:30 A.M. plaintiff's condition improved, her pain resolved and she had no neurologic deficits or difficulty speaking. After declining a lumbar puncture recommended by Firman to exclude the possibility of bleeding in her brain, plaintiff was discharged at 10:45 A.M. with a diagnosis of an acute migraine headache, a condition which can exhibit stroke-like symptoms. An MRI ordered later that same day by plaintiff's primary care physician revealed an infarct, an area of dead tissue caused by a lack of oxygen. Following plaintiff's admission to another hospital where further testing was performed, her condition was diagnosed as an ischemic stroke.[1] Plaintiff was discharged three days later.

The gist of plaintiff's complaint against both Newman and Firman was that each had been negligent in failing to diagnose her stroke, in failing to perform complete and proper physical

---

1. An ischemic stroke is a cerebral infarction caused by an inadequate supply of blood and oxygen due to a blocked artery.

and neurological examinations, and in failing to administer thrombolytic agents such as aspirin, Heparin or Lovenox. With respect to Newman only, plaintiff also alleged that he was negligent in failing to administer a particular thrombolytic agent, namely, tissue plasminogen activator (hereinafter TPA). With respect to Firman only, plaintiff also alleged that he was negligent in discharging her that morning rather than admitting her for observation. Plaintiff's primary theory of liability concerning Newman's failure to administer TPA, a drug which must be administered within three hours of the onset of a stroke, was seriously undermined at trial by proof that those three hours had passed before Newman saw plaintiff. As a result, the jury's verdict completely exonerated Newman.

With respect to Firman, the jury found no deviation from reasonable medical care in his examinations of plaintiff or in his failure to administer a thrombolytic agent such as aspirin, Heparin or Lovenox. In addition, while the jury found a deviation in Firman's failure to diagnose the stroke, it found this deviation not to be a substantial factor in causing injury to plaintiff. The only deviation found to be a substantial factor in causing injury to plaintiff was her premature discharge from the hospital. The jury went on to award $300,000 in damages for plaintiff's past pain and suffering, but declined to award any future damages. After Firman's unsuccessful motion to set aside the verdict and plaintiff's unsuccessful cross motion for an additur for future pain and suffering, these cross appeals ensued.

We cannot agree with Firman's argument that the record wholly fails to support the jury's conclusion that his deviation in discharging plaintiff without admission to the hospital for further observation was a proximate cause of her injury. The jury was asked, "Did defendant Russell Firman deviate from reasonable medical care by failing to administer thrombolytics such as aspirin, [H]eparin or [L]ovenox to [plaintiff]?" The jury answered "NO" to this question, but then answered "YES" to the next two questions: "Did defendant Russell Firman deviate from reasonable medical care when he discharged [plaintiff] from the emergency department?" and "Was Russell Firman's deviation from reasonable medical care in [the prior question] a substantial factor in causing injury to [plaintiff]?"

Contrary to Firman's contentions with respect to the first question, we cannot agree that the jury necessarily credited the defense experts, who testified that no thrombolytic treatment was then appropriate, in finding that Firman's failure to administer thrombolytic agents to plaintiff was not a departure from reasonable medical care. There is no inescapable implica-

tion that the jury exonerated Firman's failure to administer such agents only because it believed that their administration would have provided no benefit. Instead, the jury very well could have reasoned that the failure to administer the agents in the emergency room was not a deviation because an ischemic stroke had not yet been diagnosed and, thus, treatment for such a stroke was not yet medically indicated.[2] The jury did not have to find that the defense experts had established that these thrombolytic agents are ineffective or not medically recommended in order to answer this question the way it did. In fact, the first defense expert, Joel Bartfield, never opined that these thrombolytic agents are ineffective or contraindicated to prevent additional damage after an ischemic stroke. When asked on direct examination what medical professionals had done to treat such strokes before the approval of TPA by the Food and Drug Administration in the 1990s, Bartfield testified that some neurologists would start the patient on Heparin. He then switched to the present tense, adding that Heparin "is not as powerful a blood thinner as [TPA], but it prevents more blood clots from forming." He continued by stating that "[a]spirin is also typically used by most neurologists as well." Later, during cross-examination, Bartfield again stated in the present tense that agents such as Heparin and Lovenox "do decrease the likelihood of clot formation," and that a clot is a possible cause of an ischemic stroke. Thus, Bartfield did not restrict his testimony as to the beneficial effect of Heparin and similar agents to the protocol used before TPA was approved. Rather, his testimony acknowledged a medically recognized effect of such treatment that supports the jury's implicit finding that plaintiff would have benefitted if she had stayed in the hospital, been diagnosed with a stroke and treated with a thrombolytic agent.

It was only the second defense expert, James Storey, who opined on cross-examination that, while it was common practice to give Heparin for an acute stroke in the past, the data currently indicates that this thrombolytic agent "not only [does] not improve the outcome of acute stroke, but actually increase[s]

**2.** As Newman and Firman explained in their testimonies, their threshold inquiry was whether plaintiff was suffering a severe migraine headache or the effects of a stroke and, if it had been a stroke, whether it was caused by bleeding or formation of a clot. Since administration of a thrombolytic agent would have inhibited clot formation, it would be contraindicated for a bleeding stroke. Thus, the jury's finding that Firman should have diagnosed a stroke but did not deviate in failing to administer a thrombolytic agent is supported by the evidence that plaintiff's ischemic stroke, one caused by the formation of a clot, had not yet been diagnosed.

the risk of hemorrhage" as reflected in a practice advisory issued in 2004. However, Storey did *not* state that such agent would not decrease the likelihood of further clot formation in patients with ischemic stroke, and he admitted on cross-examination that his Web site includes information that aspirin may improve the outcome of a stroke.

Nor can we agree that there is no evidentiary support for the jury's finding that Firman's discharge of plaintiff without further observation and treatment caused her injuries to be worse. To support the jury's finding of proximate cause, there need only be some expert evidence that plaintiff's injuries would have been less severe if a thrombolytic agent had been administered to her following admission to the hospital and diagnosis of a stroke. As Supreme Court correctly noted, plaintiff's doctor, Allan Hausknecht, supplied that evidence. Hausknecht opined that if plaintiff had been admitted to the hospital for 24 hours of observation, rather than discharged, it would have become clear that she had suffered an ischemic stroke and she would have been given Heparin or Lovenox.[3] Inasmuch as he also opined that timely admission and treatment would have made the effects of the stroke less severe, there was expert evidence of a causal connection between Firman's failure to admit plaintiff and her injury (*see e.g. Flaherty v Fromberg*, 46 AD3d 743, 745 [2007]; *Turcsik v Guthrie Clinic, Ltd.*, 12 AD3d 883, 887 [2004]; *O'Connell v Albany Med. Ctr. Hosp.*, 101 AD2d 637, 638 [1984]). Accordingly, upon viewing the evidence in the light most favorable to plaintiff (*see e.g. Cramer v Benedictine Hosp.*, 301 AD2d 924, 928-929 [2003]), we find that there is a valid line of reasoning and permissible inferences supporting the jury's conclusion that it was a deviation for Firman to fail to admit plaintiff to the hospital for further observation, and that this deviation contributed to the injuries she sustained as a result of the stroke. Also, given that Hausknecht opined, and Bartfield implied, that administration of a thrombolytic agent can have a beneficial effect after an ischemic stroke, while only Storey denied the appropriateness of such treatment, it cannot be said that "the evidence so preponderate[d] in favor of the [defendant] that [the verdict] could not have been reached on any fair interpretation of the evidence" (*Biello v Albany Mem. Hosp.*, 49

---

**3.** We cannot conclude that the mere fact that plaintiff was not treated with a thrombolytic agent after she was eventually admitted to a different hospital undermines Hausknecht's opinion that such treatment would have been appropriate and undertaken once a diagnosis of a stroke was made. Certainly, many factors could have influenced the course of actual treatment many hours after the onset of plaintiff's stroke.

AD3d 1036, 1037 [2008] [internal quotation marks and citations omitted]; *see Cramer v Benedictine Hosp.*, 301 AD2d at 930).

Turning to Firman's remaining arguments, we find that the issue of whether there are inconsistencies in the verdict was not preserved for our review (*see e.g. City of Binghamton v Serafini*, 8 AD3d 835, 837 [2004]), and that the damages awarded to plaintiff were neither speculative nor excessive. In addition, on the record before us, we find no merit in plaintiff's contention that Supreme Court erred in denying her motion for an award of damages in the category of future pain and suffering.

Cardona, P.J., and Peters, J., concur.

Carpinello, J. (dissenting). A review of the evidence presented at trial, read in conjunction with each of the jury's answers to all of the questions on the verdict sheet, compels the conclusion that there is simply insufficient evidence to support the ultimate determination that defendant Russell J. Firman's decision to discharge plaintiff from the emergency room on the morning of January 14, 2003 caused her any injury. In any event, the verdict is against the weight of the evidence.

To recover damages for medical malpractice, a plaintiff must establish both a deviation or departure from accepted medical practice *and* that such deviation or departure was a proximate cause of the plaintiff's injuries (*see e.g. Vaughan v Saint Francis Hosp.*, 29 AD3d 1133, 1136-1137 [2006]; *Turcsik v Guthrie Clinic, Ltd.*, 12 AD3d 883, 886 [2004]; *Valentine v Lopez*, 283 AD2d 739, 741 [2001]). Based on the testimony of plaintiff's expert, Allan Hausknecht, the jury could have determined that Firman deviated from accepted medical care when he discharged plaintiff from the emergency department. In our view, however, neither Hausknecht's testimony nor any other proof credited by the jury demonstrated the requisite causal nexus between this particular departure and any injury suffered by plaintiff (*cf. Valentine v Lopez, supra*).

According to Hausknecht, Firman should have admitted plaintiff into the hospital for 24 hours of observation, during which time it would have been clear that she was having a stroke and she could have received a thrombolytic agent such as Heparin or Lovenox. Specifically, according to Hausknecht, because plaintiff was not admitted and treated with "an anticoagulant of some sort or another . . . she probably had a little larger stroke than she should have had if she was properly treated," although he readily acknowledged that "[i]t's very

hard to quantify."[1] Notably, no other hospital-based treatment options were testified to by Hausknecht.

Proof submitted by the defense established that these particular thrombolytic agents have not been used for many years to treat ongoing strokes because they have not been proven to be effective and actually increased the risk of complications. Importantly, the jury clearly credited this proof as it found, in response to a specific question, that Firman's failure to administer such agents was *not* a departure from reasonable medical care. The jury also found that Firman's failure to diagnose plaintiff's stroke, while a deviation from reasonable medical care, did not cause her injury.[2] Thus, the only possible causal nexus between plaintiff's discharge and any injury arising from the discharge had to have been based on this theory of administering a thrombolytic agent that was not a tissue plasminogen activator (hereinafter TPA); however, the jury specifically found no malpractice stemming from the failure to administer these drugs. Thus, there is nothing in the record to connect the finding of malpractice due to discharging plaintiff and the worsening of her injuries.

To the extent that the majority points out that defense witness Joel Bartfield testified that thrombolytic agents "decrease the likelihood of clot formation" and some neurologists would use Heparin or aspirin to prevent more blood clots from forming, his testimony was in response to a question about *past* practices of physicians, namely, "before the approval [of TPA] by the [Food and Drug Administration] in [the] mid 1990s." So limited, this testimony does not support the verdict. Nor is the majority's reliance on Bartfield's cross-examination testimony at all instructive on the disputed issue before this Court. The questions and answers during cross-examination surrounding Heparin and Lovenox plainly relate to *causes* of strokes and have nothing to do with *treatment*. Thus, his testimony did not directly or impliedly "acknowledge[ ] a medically recognized effect of such treatment that supports the jury's implicit finding that plaintiff would have benefitted if she had stayed in the hospital, been diagnosed with a stroke and treated with a thrombolytic agent" or in any way remotely imply, as found by the majority, "that administration of a thrombolytic agent can

1. Indeed, Hausknecht testified that the question of whether Firman's "deviations" caused plaintiff's injury was "a much more difficult question to answer."

2. While Heparin was ultimately administered, it was done so on January 16, 2003 (i.e., outside the 24-hour period discussed by Hausknecht) as a prophylactic measure in response to a protein C deficiency and not as treatment for the stroke.

have a beneficial effect after an ischemic stroke." In short, Bartfield never opined or implied anything of the sort.

Absent any evidentiary basis for concluding that Firman's discharge of plaintiff was a proximate cause of her injuries, the verdict against him cannot stand (*see Rampe v Community Gen. Hosp. of Sullivan County*, 241 AD2d 817, 819 [1997], *lv denied* 91 NY2d 806 [1998]). Even considering the evidence in a light most favorable to plaintiff, since the jury found that there was no deviation of care in failing to administer a non-TPA thrombolytic agent and that Firman's negligence in failing to diagnose the stroke did not cause her injury, "there is simply no valid line of reasoning . . . [that] could possibly lead . . . to the conclusion" (*Cohen v Hallmark Cards*, 45 NY2d 493, 499 [1978]; *accord Imbierowicz v A.O. Fox Mem. Hosp.*, 43 AD3d 503, 505 [2007]; *Cramer v Benedictine Hosp.*, 301 AD2d 924, 928-929 [2003]) that Firman's discharge of her was a substantial factor contributing to the severity of her injuries. Consequently, Firman's motion to set aside the verdict on this ground should have been granted.

In order to preserve this verdict, plaintiff now attempts to characterize Firman's failure to administer thrombolytic therapy as a "consequence" of his failure to admit her to the hospital rather than an independent act of negligence. In other words, according to plaintiff, "[y]ou cannot treat that which you have not diagnosed." This contention, which has persuaded the majority, is nothing more than an ad hoc postverdict rationalization. First, it ignores the jury's finding that Firman's negligence in failing to diagnose the stroke did not cause injury. Additionally, the failure to administer a thrombolytic agent *was* included on the verdict sheet as an independent act of negligence and was specifically rejected by the jury. Plaintiff's attempt to massage the proof at trial to support this theory of liability on appeal should not be countenanced. Moreover, if, as *now* argued by plaintiff and accepted by the majority, Firman could not treat what he did not diagnose, then there was no reason to include any question pertaining to the administration of a thrombolytic agent on the verdict sheet in the first place.

Ultimately, what this case really boils down to is an inconsistent verdict. While Firman admittedly failed to object to the verdict prior to the jury's discharge (*see e.g. Barry v Manglass*, 55 NY2d 803, 805-806 [1981]), there was nonetheless an objection to "the deviation questions" contained on the verdict sheet. Even assuming that the issue of inconsistent verdict is not sufficiently preserved, "this is a distinction without a difference in this case since the claim that the verdict is against the weight of

the evidence is preserved and we find it has merit" (*Lockhart v Adirondack Tr. Lines*, 305 AD2d 766, 767 [2003]; *see Skowronski v Mordino*, 4 AD3d 782, 782 [2004]; *Bendersky v M & O Enters. Corp.*, 299 AD2d 434, 435 [2002]; *Simmons v Dendis Constr.*, 270 AD2d 919, 920-921 [2000]). In our view, the evidence concerning whether Firman's negligence in discharging plaintiff caused damages so preponderated in favor of him that the jury could not have reached its verdict on any fair interpretation of it (*see Lolik v Big V Supermarkets*, 86 NY2d 744, 746 [1995]).

On this issue, it must be emphasized that the gravamen of plaintiff's case was that TPA should have been administered by the first treating emergency department physician, defendant James P. Newman. Charitably stated, this theory, as presented through Hausknecht's testimony, was seriously undermined at trial and was ultimately rejected by the jury as a basis for liability because plaintiff did not present in time for TPA to be safely administered. With the crux of the case destroyed, the remaining proof was presented in an attempt to establish that other separate acts of negligence occurred. These separate theories of negligence were mostly rejected by the jury (i.e., the jury found that Firman's negligent failure to diagnose the stroke did *not* cause damage, that Firman did *not* deviate from reasonable medical care in his examinations of plaintiff, and that Firman did *not* deviate from reasonable medical care in failing to administer a thrombolytic agent).

Since no treatment other than administering a non-TPA thrombolytic agent was discussed by Hausknecht, there is a complete dearth of evidence to sustain the finding of causation as a result of the negligent discharge. As noted previously, Hausknecht testified that plaintiff "probably [would have] had a little larger stroke than she should have had" if a thrombolytic agent had been administered to her following her admission into a hospital. But plaintiff offered no evidence whatsoever to differentiate between the injuries attributable to the stroke itself and those attributable to the failure to admit. The jury therefore was left to speculate on this issue (*see e.g. Migliaccio v Good Samaritan Hosp.*, 289 AD2d 208, 209 [2001], *lv denied* 98 NY2d 607 [2002]; *Prete v Rafla-Demetrious*, 224 AD2d 674, 676 [1996]; *Kennedy v Peninsula Hosp. Ctr.*, 135 AD2d 788, 792 [1987]; *cf. Valentine v Lopez*, 283 AD2d at 742).

Additionally, the reliability of Hausknecht's opinion was severely undermined by the events that actually transpired that day. Hausknecht opined that plaintiff should have been admitted for a 24-hour period of observation during which time a thrombolytic agent could have been administered. Tellingly,

plaintiff *was* evaluated by her own primary care physician on the afternoon of January 14, 2003 and *was* admitted into a hospital that day where a stroke was diagnosed. *At no time* during this 24-hour period did any physician administer a thrombolytic agent. Had plaintiff not received additional medical care that very day and had she not in fact been admitted into a hospital within the 24-hour period of observation discussed by Hausknecht, and had she been administered a thrombolytic agent that day, then his testimony about the appropriate protocol might carry some weight. Because no other physician prescribed a thrombolytic agent, his opinion is without factual support. For these reasons, in addition to being legally insufficient, we do not find that any fair interpretation of the evidence can support the verdict.

Malone Jr., J., concurs.

Ordered that the order and judgment are affirmed, without costs.