YKIMOFF v W A FOOTE MEMORIAL HOSPITAL

Docket No. 279472. Submitted February 3, 2009, at Detroit. Decided July 16, 2009, at 9:00 a.m.

James Ykimoff brought a medical malpractice action in the Jackson Circuit Court against W.A. Foote Memorial Hospital, David Eggert, M.D., and David Prough, M.D., seeking damages for injuries related to a blood clot that formed following an aortofemoral bypass graft surgery. The court, Edward, J. Grant, J., dismissed Prough from the action and granted partial summary disposition for the hospital and summary disposition for Eggert after considering deposition testimony by the plaintiff's expert witness that Eggert had not breached any applicable standard of care. The remainder of the plaintiff's claims against the hospital, premised on the negligence of the nurses' monitoring the plaintiff's condition after the surgery and failing to report his status and symptoms to Eggert in a timely manner, proceeded to a jury trial. The jury returned a verdict in the plaintiff's favor, to which the court applied the noneconomic damages cap provided in MCL 600.1483(1) for medical malpractice actions. After the court denied the hospital's motion for a new trial or judgment notwithstanding the verdict, the hospital appealed. The plaintiff cross-appealed.

The Court of Appeals *held*:

1. While Eggert indicated that he would not have intervened earlier even if the nursing staff had contacted him regarding the changes in the plaintiff's postoperative condition, the opinion of the plaintiff's expert created a question of fact regarding whether the blood clot caused the plaintiff's injuries, and that question was solely for the jury to decide. The plaintiff was required to prove that the hospital's negligence was the proximate cause of the plaintiff's injuries, that is, that it more probably than not caused those injuries. Eggert's assertion that he would have not acted differently or intervened sooner was speculative, and discrepancies between his testimony and the symptoms documented by the nurses raised issues of credibility. Because establishing proximate cause hinged on the credibility of Eggert's averments, the trial court properly submitted the matter to the jury for resolution.

2. The factual circumstances of this case are distinguishable from those in *Martin v Ledingham*, 282 Mich App 158 (2009), on which the hospital relied, and *Martin* does not apply to this case.

3. The plaintiff pleaded only a basic negligence action, and it is not reviewable as a case of a lost opportunity to achieve a better result.

4. The trial court erred by permitting witnesses to testify regarding the plaintiff's integrity or character after the hospital submitted into evidence a surveillance video purportedly demonstrating that the plaintiff was not as physically limited as he alleged in his complaint. While the video impliedly impugned the plaintiff's truthfulness, the testimony went beyond the evidence of the plaintiff's reputation for truthfulness permitted under MRE 608(a)(2). The error, however, was harmless.

5. The trial court did not err by excluding testimony from members of the plaintiff's family indicating that the nursing staff had contacted Eggert and that he did not respond, which the standard of care required him to do. The testimony would have related to comments made by the nurses that the family members overheard. The statements, however, were not admissible as present sense impressions under MRE 803(1) or as statements of the declarant's then existing mental, emotional, or physical well-being under MRE 803(3).

6. Any failure by the trial court to give a curative instruction related to questions by the plaintiff's counsel on the statutory duties of nurses to document the administration of medications was harmless.

7. Under MCL 600.1483(1), the damages recoverable in a medical malpractice action for noneconomic loss are limited. If an exception applies, the damages recoverable are capped at a higher amount. MCL 600.1483(1)(c) allows use of the higher cap when there has been permanent loss or damage to a reproductive organ resulting in the inability to procreate. The plaintiff claimed that he suffered from erectile dysfunction, but he did not demonstrate that the condition precluded his ability to "beget offspring." Plaintiff also asserted that nerve damage resulted in a loss of sensation and inability to achieve or maintain an erection, not that there was damage to a reproduction organ. The trial court erred by applying the higher damages cap to the jury's award.

Affirmed in part, judgment vacated in part, and case remanded for recalculation of damages.

TALBOT, P.J., wrote further to express concern that the analysis of *Martin* in the concurring opinions might unnecessarily compli-

cate the factors to be used by courts in similar cases and to set forth his disagreement with Judge GLEICHER's comparison of *Martin* and this case.

BANDSTRA, J., concurred with Judge TALBOT's opinion and wrote separately to explain his conclusion that this case differed from *Martin* and his disagreement with Judge GLEICHER's approach to analyzing the issues.

GLEICHER, J., agreed that the trial court properly denied the hospital's motion for a new trial or judgment notwithstanding the verdict and correctly granted summary disposition for Eggert and that the higher cap for noneconomic damages did not apply, but disagreed that this case and *Martin* were logically distinguishable and wrote separately to further analyze that issue.

*Fieger, Fieger, Kenney, Johnson & Giroux, P.C.* (by *Geoffrey N. Fieger, Robert M. Giroux, Jr.,* and *Heather A. Jefferson*), for James Ykimoff.

*Foley, Baron & Metzger, PLLC* (by *Judith A. Sherman* and *Clyde M. Metzger*), for W.A. Foote Memorial Hospital.

Before: TALBOT, P.J., and BANDSTRA and GLEICHER, JJ.

TALBOT, P.J. W. A. Foote Memorial Hospital ("defendant" or "the hospital") appeals as of right a judgment in favor of plaintiff, James Ykimoff, following the trial court's denial of its motion for a new trial or for judgment notwithstanding the verdict (JNOV) in this medical malpractice action. Plaintiff cross-appeals the trial court's order granting partial summary disposition, which resulted in the dismissal of plaintiff's malpractice claims against his surgeon, Dr. David Eggert. We affirm in part, vacate the judgment in part, and remand.

### I. FACTS AND PROCEDURAL HISTORY

On November 7, 2001, because of circulation problems in his left hip resulting in claudication and pain,

plaintiff underwent an aortofemoral bypass graft. Dr. Eggert performed the surgery at the hospital. Reportedly, the duration of the surgery was prolonged because of the severity of the blockages in plaintiff's aorta below the renal arteries, which were described as being "rock-hard." During the procedure, Dr. Eggert was required to completely clamp off blood flow to plaintiff's legs. Surgery was initiated at 2:10 p.m., and plaintiff was not received in the post-anesthesia care unit (PACU) for monitoring until 6:26 p.m. Initially, when Nurse Melinda Piatt received plaintiff in the PACU, Doppler examination could detect post-tibial pulses, and plaintiff demonstrated an ability to move his lower extremities.[1] However, shortly thereafter, plaintiff began to report consistent and severe pain, the loss of sensation in his legs, and pressure in his pelvis and lower extremities. Plaintiff's blood pressure was low when he was transferred to the PACU and dropped while in that unit. Plaintiff's legs were also observed to be pallid and cool while in the unit. At approximately 8:40 p.m., when the skin of plaintiff's right leg began to demonstrate mottling, the nursing staff contacted Dr. Eggert. Dr. Eggert returned to the hospital and was examining plaintiff by 9:12 p.m., at which time he determined that plaintiff needed to return to the operating room. At 9:45 p.m., Dr. Eggert commenced exploratory surgery to evaluate blood flow and found a clot in the graft site. A thrombectomy of the right limb of the aortofemoral graft was performed, removing a blockage to the blood supply to plaintiff's lower extremities.

---

[1] Nurse Marlene Desmarais assumed primary nursing responsibility for plaintiff in the PACU at 7:45 p.m., even though Piatt remained in the unit until approximately 8:05 p.m. to complete charting and assist with patient care.

Following the second surgery, plaintiff experienced bilateral lower extremity weakness and numbness. He remained a patient at the hospital until November 13, 2001, when he was transferred to the University of Michigan Hospital (U of M) for further care and treatment. While at U of M, plaintiff was diagnosed with bilateral lumbar plexopathy due to ischemia or lack of blood flow. Although plaintiff's condition improved over time and with rehabilitation, he continues to report residual effects involving "tremendous deficits relative to the use of his legs."

On March 12, 2004, plaintiff filed this action, alleging medical malpractice against the hospital and Drs. Eggert and David Prough. While Dr. Prough was dismissed because of his lack of involvement in plaintiff's care, plaintiff alleged negligent treatment by both Dr. Eggert and the nursing staff of the hospital. With his complaint, plaintiff filed an affidavit of merit by Dr. Daniel Preston Flanigan to support his assertions of negligence and breach of the applicable standard of care. Specifically, Dr. Flanigan opined that defendants, while caring for plaintiff after the initial surgery, permitted "the vascular occlusion to exist for an extended period of time such that the lack of blood flow caused ischemia and the prolonged ischemia caused cell death and permanent damage to the muscles and nerves." The hospital and Dr. Eggert successfully obtained partial summary disposition regarding the claims against Eggert on the basis of deposition testimony by Dr. Flanigan that Dr. Eggert had not breached any applicable standards of care during his treatment of plaintiff.

A jury trial proceeded on the remainder of plaintiff's claims against the hospital, which alleged negligence of the PACU nurses, Piatt and Desmarais, in monitoring plaintiff's condition and failing to report his status and

symptoms to Dr. Eggert in a timely manner. The jury found in favor of plaintiff, and an order for judgment on the jury's verdict in the amount of $1,402,601.44 was entered on March 26, 2007, following application of the medical malpractice noneconomic damages cap. The trial court subsequently denied defendant's motion for JNOV or a new trial, and this appeal ensued.

## II. SYNOPSIS OF CLAIMS

The claims of malpractice raised by plaintiff are premised on the care received in the hospital's PACU by the assigned nursing staff, Melinda Piatt and Marlene Desmarais, and their failure to contact Dr. Eggert regarding signs of a vascular emergency, which delayed surgical intervention for a blood clot. Plaintiff's expert witness contended that the blood clot began to form immediately following the first surgery and that the symptoms displayed by plaintiff in the PACU should have alerted the nursing staff to the condition and the need to contact the treating physician. Plaintiff's expert contended that earlier contact and resultant intervention would have either avoided any residual impairment now experienced by plaintiff or substantially reduced its severity.

In contrast, relying on testimony by Dr. Eggert, defendant asserts that the blood clot formed only minutes before plaintiff's skin demonstrated mottling and that any residual impairment is neurological in nature and derived from the necessity of prolonged clamping off of blood flow during the surgery because of the severity of the blockages. Defendant further contends that liability against the hospital is precluded by the inability to establish proximate causation, given Dr. Eggert's assertion that the symptoms demonstrated by plaintiff in the PACU did not indicate a vascular emergency and that even if he had been contacted and

informed of these symptoms earlier by the nursing staff, he would not have taken any action or intervened surgically.

### III. STANDARD OF REVIEW

This Court reviews de novo both a lower court's decision on a motion for summary disposition, *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999), and the grant or denial of a motion for JNOV, in the latter situation viewing "the evidence and all legitimate inferences in the light most favorable to the nonmoving party," *Craig v Oakwood Hosp*, 471 Mich 67, 77; 684 NW2d 296 (2004) (quotation marks and citations omitted). JNOV is properly granted only if the evidence fails to establish a claim as a matter of law. *Id.* Because issues of statutory interpretation involve questions of law, they are also subject to review de novo. *Eggelston v Bio-Med Applications of Detroit, Inc*, 468 Mich 29, 32; 658 NW2d 139 (2003).

A trial court's denial of a request for a curative instruction is reviewed for an abuse of discretion. *Schutte v Celotex Corp*, 196 Mich App 135, 142; 492 NW2d 773 (1992). Similarly, preserved evidentiary issues are reviewed for an abuse of discretion, *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006), while unpreserved evidentiary issues are reviewed for plain error affecting the party's substantial rights, *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 700; 630 NW2d 356 (2001); MRE 103(a)(1).

### IV. ANALYSIS

#### A. NEGLIGENCE AND PROXIMATE CAUSE

The primary contention regarding whether plaintiff can establish his claim of malpractice centers on the

issue of proximate cause. Our Legislature has defined the applicable causation standard for medical malpractice cases in MCL 600.2912a(2), which provides in relevant part: "In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants." The general principles pertaining to causation in an action for medical malpractice were recently reviewed by this Court in *Robins v Garg (On Remand)*, 276 Mich App 351, 362; 741 NW2d 49 (2007):

> "Proximate cause" is a term of art that encompasses both cause in fact and legal cause. *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). "Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or 'but for') that act or omission." *Id.* at 87. Cause in fact may be established by circumstantial evidence, but the circumstantial evidence must not be speculative and must support a reasonable inference of causation. *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 496; 668 NW2d 402 (2003). " 'All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty.' " *Skinner v Square D Co*, 445 Mich 153, 166; 516 NW2d 475 (1994), quoting 57A Am Jur 2d, Negligence, § 461, p 442. Summary disposition is not appropriate when the plaintiff offers evidence that shows "that it is more likely than not that, but for defendant's conduct, a different result would have been obtained." *Dykes v William Beaumont Hosp*, 246 Mich App 471, 479 n 7; 633 NW2d 440 (2001).

If circumstantial evidence is relied on to establish proximate cause, the evidence must lead to a reasonable inference of causation and not mere speculation. In addition, the causation theory must demonstrate some

basis in established fact. *Skinner, supra* at 164. As further guidance, our Supreme Court has stated:

> " 'As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.' " [*Id.*, quoting *Kaminski v Grand Trunk W R Co*, 347 Mich 417, 422; 79 NW2d 899 (1956) (citation omitted).]

In summary, when circumstantial evidence is relied on, it must provide a "reliable basis from which reasonable minds could infer that more probably than not, but for" the wrong or negligence an injury would not have occurred. *Skinner, supra* at 170-171.

Defendant contends that proximate cause cannot be established because Dr. Eggert definitively indicated he would not have intervened sooner even if the nursing staff had contacted him regarding changes in plaintiff's condition while in the PACU. In contrast, plaintiff argues that his expert's opinion regarding onset of the clot and breach of the applicable standard of care created a genuine issue of material fact pertaining to the issue of causation that was appropriately submitted and resolved by the jury. At the outset of analyzing this issue, it should be noted that the parties do not dispute that plaintiff experienced a blood clot in the graft site following the initial surgery. Rather, the parties disagree regarding the timing of the formation of the clot and its resultant effect on the residual impairments

claimed by plaintiff. In the most basic sense, this dispute, which relies on the opinions and credibility of plaintiff's expert and surgeon, clearly comprises a question of fact appropriate for a jury determination. Although Dr. Flanigan disagreed with Dr. Eggert regarding the onset or timing of the formation of the clot and the effect of delay in diagnosis and treatment, that disagreement did not contradict any of the established facts and, therefore, the opinion of plaintiff's expert was not impermissibly speculative. Flanigan's opinion created a question of fact regarding whether the blood clot caused plaintiff's bilateral lumbar plexopathy, which was solely within the purview of the trier of fact to resolve.

Although plaintiff has established a factual issue pertaining to the cause of his alleged injury, it remains incumbent on him to further demonstrate that the injury incurred was "more probably than not" caused by defendant's negligence. MCL 600.2912a(2). In this case, defendant contends that any negligence by the nursing staff in failing to timely identify the signs of a blood clot is irrelevant and cannot lead to an imposition of liability because proximate cause cannot be established given Dr. Eggert's unequivocal assertion that even if he had been notified or contacted earlier regarding plaintiff's condition, he would not have acted any differently or intervened any sooner. In asserting this position, defendant relies on this Court's recent decision of *Martin v Ledingham*, 282 Mich App 158, 163; 774 NW2d 328 (2009), which in turn cited caselaw from Illinois[2] and Ohio,[3] determining "that liability can be

---

[2] *Seef v Ingalls Mem Hosp*, 311 Ill App 3d 7; 724 NE2d 115 (1999).

[3] *Albain v Flower Hosp*, 50 Ohio St 3d 251; 553 NE2d 1038 (1990), overruled in part on other grounds by *Clark v Southview Hosp & Family Health Ctr*, 68 Ohio St 3d 435 (1994).

imposed for a failure to adequately report to a physician only if the physician would have, *in fact*, altered a diagnosis or treatment had a better or earlier report been received." (Emphasis added.) Similar to the case now before this Court, in *Martin* the plaintiff alleged that the nursing staff was negligent in failing to report the plaintiff's worsening postsurgical condition to the treating physician and that such negligence comprised the proximate cause of her injuries. The treating physician in *Martin* averred

> that he had ample information regarding plaintiff and her situation throughout the period during which plaintiff alleges care was deficient, that he reviewed plaintiff's chart and was otherwise adequately apprised of developments, and that nothing the nurses could have done differently would have altered the care that he provided plaintiff. [*Id.* at 162.]

This Court upheld the trial court's grant of summary disposition in favor of defendants, "because there was no evidence showing that plaintiff's treatment would have been changed if better reporting had occurred . . . ." *Id.* at 159. In explaining the reasoning for this holding, the Court indicated "that a fact-finder's determination that there was cause in fact merely because the fact-finder disbelieved the doctors involved would be exactly the kind of speculation that *Skinner* disapproved in the absence of any affirmative cause-in-fact proof advanced by plaintiff." *Id.* at 163. The very fact-intensive nature of the ruling in *Martin* necessarily leads to concern regarding the broader applicability of that decision and the implied effect on legitimate issues pertaining to credibility in determining proximate causation and usurpation of the jury's role. Thus, we are required to cautiously evaluate the applicability of *Martin* to the factual circumstances of this case.

It is important to recognize that the factual circumstances of *Martin* are distinguishable from those of plaintiff's case. In *Martin*, the treating physician was apprised of his patient's condition on an ongoing basis, but elected not to intervene or alter the course of treatment despite having this information. Consequently, the physician in *Martin*, in averring that the nursing staff could not have done anything differently to affect his treatment decision, was describing his actual analysis of the presenting situation and subsequent action or inaction and was neither speculating nor relying on hindsight. His verbal assertions were consistent with his actual behavior. Therefore, because of the documented factual history, the physician's assertion was not subject to a credibility determination.

In contrast, Dr. Eggert's assertion that he would not have acted differently or intervened sooner, despite the fact that he was not kept informed of plaintiff's changing condition or symptoms, was speculative at best and self-serving at worst. Although Dr. Eggert acknowledged that given the protracted length of plaintiff's surgery, it was "critical to follow" his condition because of the potential for the formation of an occlusion or clot, he contended that until plaintiff evidenced *mottling* of the skin, the various symptoms he demonstrated in the PACU did not indicate a vascular emergency. Specifically, Eggert testified that until a full clot was formed, the mottling would not appear. He asserted that the mottling probably occurred within 5 to 10 minutes of the formation of the clot, suggesting very limited lead time to discern the need for intervention.

While testifying at trial, Dr. Eggert characterized the existence of mottling as an "obvious" and "dramatic" finding (i.e., "not subtle"), implying that other signs or symptoms should have been detected earlier. Because

the mottling was "clearly recognizable" when Dr. Egg-ert returned to the hospital, he immediately prepared plaintiff for a follow-up surgery. However, contrary to Dr. Eggert's own testimony that until the presence of the mottling a vascular condition could not be identified, he also testified that plaintiff's inability to use his leg or foot, coupled with the mottling, alerted the nursing staff to the presence of a vascular condition. Notably, the nursing staff observed and documented changes in plaintiff's ability to move his legs and loss of sensation in those extremities as early as 7:45 p.m., approximately one hour before Dr. Eggert was contacted by the PACU nurses.

The record clearly evidences the ongoing observation and consistent report of symptoms such as pain, pressure in the lower legs, lack of movement, sensation, and pulse, and problems with blood pressure almost from the moment of plaintiff's acceptance into the PACU. A review of Dr. Eggert's testimony demonstrates that the presence of these symptoms signified the onset of a clot detected earlier and consistently by PACU nurses before the "dramatic" and definitive symptom of mottling occurred. Specifically, Dr. Eggert acknowledged that an occlusion could cause pain. As early as 6:55 p.m., plaintiff consistently reported pain levels of 8 on a scale of 1 to 10 while in the PACU. Dr. Eggert also acknowledged that an occlusion could cause loss of sensation and movement. Nursing records indicate plaintiff had difficulty moving his legs and experienced a loss of sensation as early at 6:55 p.m.[4] Dr. Eggert also agreed that an occlusion could cause legs to look pale longer after surgery. Nursing notes and testimony indicated that plaintiff's legs were both pallid (more on the right

___

[4] Changes in plaintiff's ability to move his lower extremities were noted in the PACU record at least as early as 7:10 p.m.

than the left) and cool and did not demonstrate significant improvement while plaintiff was in recovery. In response to questioning, Dr. Eggert also acknowledged that pressure in the lower legs could be a sign of an occlusion. This is a symptom documented by PACU nurses at approximately 7:00 p.m. Dr. Eggert mistakenly believed that the feeling of pressure was exclusively in plaintiff's pelvis rather than his lower legs. In addition, Dr. Eggert opined that low blood pressure constitutes "one of the precipitating factors" in determining the existence of a clot. Plaintiff's blood pressure was low when he arrived in the PACU. In fact, the nursing staff could not administer an epidural in accordance with the anesthesiologist's orders because of plaintiff's blood pressure initially being too low. A review of the PACU record shows a significant drop in plaintiff's blood pressure at 8:10 p.m., but nursing staff acknowledged that plaintiff was having blood pressure problems as early as 7:55 p.m.

Dr. Eggert's admission that his postoperative notes summarized "what I thought" had transpired in the recovery room/PACU serves to demonstrate the speculative nature of his averment that the provision of timely information by nursing staff would not have affected his actions. In particular, because of the discrepancies between Dr. Eggert's testimony and the documented symptoms, Dr. Eggert's statement, "Regardless of what the record says, I know they're following the patient and assessing for vascular problems and did not find any *at all* until the thrombosis took place, at which time it became clear," raises issues of credibility. Dr. Eggert's absolute assertion that he would not have intervened sooner, even if the PACU nurses had contacted him and related plaintiff's symptoms, is particularly suspect because of the immediacy of his initiation of surgical intervention upon arrival at the hospital.

In *Martin*, the credibility of the treating physician
was not called into question both because he was kept
apprised of his patient's condition on an ongoing basis
and because his actual behavior regarding medical
intervention completely coincided with his subsequent
assertions. However, unlike the physician in *Martin*, Dr.
Eggert's credibility was not eliminated as an issue;
rather it was pushed to the forefront. The reasoning in
*Martin* cannot be applied pro forma to the factual
circumstances of this case because its application is
limited to situations demonstrating a conformance be-
tween verbal assertions and actual behavior. Because
establishment of proximate cause hinged on the cred-
ibility of Dr. Eggert's averments, which could not be
shown retrospectively to conform to the medical records
and testimony elicited, the matter was properly submit-
ted to the jury for resolution. *Skinner, supra* at 161.

This cautionary approach in evaluating averments
such as those made by Dr. Eggert is supported by
analyzing other "failure to inform cases," such as those
relied on in *Martin*. In *Albain v Flower Hosp*, 50 Ohio St
3d 251; 553 NE2d 1038 (1990), overruled in part on
other grounds by *Clark v Southview Hosp & Family
Health Ctr*, 68 Ohio St 3d 435 (1994), the defendant was
found not to be liable because of the failure of nursing
staff to fully inform the staff physician regarding the
condition of the patient. A pregnant woman presented
at the hospital with a bloody vaginal discharge. She was
admitted, and after an initial examination by a resident,
it was determined that the on-call staff obstetrician
should be contacted. At the time, the obstetrician was
seeing private patients at a site away from the hospital
but was informed of the patient's condition and pro-
vided orders for her care. The obstetrician was updated
approximately 90 minutes later and because of the
information received, indicated that she would come to

the hospital by 5:30 p.m. at the conclusion of her office hours. The obstetrician did not finish at her office until 6:00 p.m. and, instead of proceeding directly to the hospital, went home to eat dinner. Staff again contacted the obstetrician at home at 7:00 p.m., and additional tests were ordered. The obstetrician did not examine the patient until 8:00 p.m. Following a consult with another physician, it was determined that the patient should be transferred to another hospital. By the time the patient was transferred and evaluated, an emergency cesarean section was performed, but the baby died of "complications of neonatal asphyxia . . . ." *Id.* at 253.

In *Albain*, the expert opined that medical intervention to avoid the injury needed to have occurred between 4:00 p.m. and 5:00 p.m. *Id.* at 265. Although the nursing staff failed to inform the on-staff obstetrician of the vaginal bleeding, the obstetrician indicated that if she had been apprised of the bleeding, she would have come to the hospital sooner, around 5:30 p.m., but would not have altered the course of treatment. Importantly, this assertion was verified by the fact that even when the physician arrived at the hospital at 8:00 p.m., she did not diagnose the condition or ascertain any imminent danger to the child. Hence, this situation was factually similar to that of *Martin* because the determination that "even if the nurses were so negligent, such negligence was not the proximate cause of the terrible loss suffered" was based on the actual behavior of the physician, not speculation. *Id.* at 266.

*Albain* is particularly instructive with regard to its discussion regarding the necessity of expert testimony to demonstrate proximate cause. Specifically, the opinion demonstrates the interrelationship between the standard of care and proximate cause, indicating, in relevant part:

[A]ccepted standards of nursing practice include a duty to keep the attending physician informed of a patient's condition so as to permit the physician to make a proper diagnosis of and devise a plan of treatment for the patient.

This duty, and an alleged breach thereof, raise issues of proximate cause. Even assuming that a nurse breached this duty to inform the attending physician of a patient's condition, it must further be shown that such breach was the proximate cause of the patient's injury before the hospital will be held vicariously liable therefor. Thus, a plaintiff must prove that, had the nurse informed the attending physician of the patient's condition at the proper time, the physician would have altered his diagnosis or treatment and prevented the injury to the patient. The trier of fact must be provided expert testimony that the injury was more likely than not caused by the nurse's negligence. [*Id.* at 265 (citations omitted).]

In a subsequent case, *Gill v Foster*, 157 Ill 2d 304, 311; 626 NE2d 190 (1993), the Illinois Supreme Court ruled that "even assuming the nurse had breached a duty to inform the treating physician of the patient's complaint, this breach did not proximately cause the delay in the correct diagnosis of the plaintiff's condition." In *Gill*, the plaintiff was hospitalized, and surgery was conducted to correct his reflux esophagitis. Postsurgery progress notes by the physician indicated that the plaintiff complained of chest pain. The physician determined the pain to be related to the surgery and a possible muscle pull from vomiting. The plaintiff continued to complain of chest pain during his discharge, but was advised by the nurse to seek follow-up care with his family doctor. Ultimately, the plaintiff was diagnosed with a herniation of the stomach into the chest, which had occurred before his discharge from the hospital. Importantly, the condition was deemed to have occurred before the physician's progress note indicating that he had evaluated the plaintiff but did not diagnose

this condition. As such, the holding in *Gill* was contingent on the factual record, which established that the "treating physician had repeated contacts with plaintiff . . . and failed to properly diagnose the problem." *Id.* at 310.

*Rampe v Community Gen Hosp of Sullivan Co*, 241 AD2d 817; 660 NYS2d 206 (1997), involved a case of fetal monitoring and distress. The treating physician was apprised of changes in the fetal heart rate, but did not immediately undertake to perform a cesarean section. The court rejected the plaintiff's contention "that an additional phone call would have caused [the physician] to act with greater celerity . . . ." *Id.* at 819. However, there was neither a demonstration that the physician was not informed of the condition nor expert testimony to support that additional attempts at contact would have altered the physician's response. Consequently, the trial court determined that the nursing staff and the hospital could not be found liable because proximate cause could not be established.

The decision in *Seef v Ingalls Mem Hosp*, 311 Ill App 3d 7; 724 NE2d 115 (1999), is also factually distinguishable. In *Seef*, a pregnant woman was admitted to the hospital and placed on a fetal monitor. The treating physician came to the hospital and examined the patient. The physician watched the monitor's printout strips for approximately 15 to 20 minutes, but indicated that he did not interpret the existence of a problem. The physician retired to the doctor's lounge, while the patient remained on the monitor and under the observation of the nursing staff. The physician was awakened by a call from the nursing staff and, at that time, found abnormalities in the monitoring strips sufficient to raise concerns. On further evaluation, the physician performed an emergency cesarean section. Unfortunately, the infant was stillborn.

Once again, the physician testified that "even if he had seen the monitor strips prior to 3:05 a.m., he would not have done anything differently." *Id.* at 10. Notably, in this instance, the physician's indication that he would not have intervened sooner was not subject to an attack based on credibility because his statement

> was neither self-serving nor hypothetical. Rather, [the doctor] made an inculpatory, unequivocal statement regarding his mental state at the time of the incident. He took full blame for the baby's death by admitting that, based upon the state of his knowledge at the time, he misapprehended the seriousness of the situation. He admitted that, in hindsight, the baby should have been delivered sooner. [*Id.* at 16.]

The court further determined that the obligation of the nurses to notify a supervisor was too speculative because of the failure to first notify the treating physician and the absence of expert testimony to provide an opinion regarding what another physician might have done if the treating physician had been notified and failed to act. *Id.* at 17.

Finally, in *Suttle v Lake Forest Hosp*, 315 Ill App 3d 96; 733 NE2d 726 (2000), the court distinguished *Gill*. In *Suttle*, a factual issue was found to exist regarding what the physician would have done had he been aware of the patient's condition. Specifically, *Gill* was determined to be inapposite because

> [i]n this case there was a factual issue as to what Dr. Salter would have done had he known of the condition of the placenta. In *Gill*, there was no factual dispute concerning what the doctor would have done had he known of the plaintiff's chest pains, because in fact he did know. In the instant case, there is testimony that Dr. Salter diagnosed Diana as suffering from respiratory distress syndrome, rather than hypovolemic shock, because he was *unaware* of Ms. Suttle's velamentous insertion. It is undisputed that

evidence which shows to a reasonable degree of certainty that negligent delay in diagnosis or treatment lessened the effectiveness of treatment is sufficient to establish proximate cause. [*Id.* at 104 (emphasis in original).]

This survey of caselaw serves to illustrate that a determination regarding the presence or absence of proximate cause is highly fact-dependent and that these determinations, by their very nature, do not lend themselves to an overly broad formulation. Because *Martin* and other such cases should be construed very narrowly, *Martin* is not applicable to the facts of this case.

### B. LOST OPPORTUNITY DOCTRINE

Contrary to defendant's argument on appeal, there is no basis for this Court to review this matter as a lost opportunity case, pursuant to MCL 600.2912a(2). A review of the lower court file, particularly the complaint and affidavit of merit, shows that plaintiff pleaded only a basic negligence action and not a lost opportunity to obtain a better result. "A plaintiff's theory in a medical malpractice case must be pleaded with specificity and the proofs must be limited in accordance with the theories pleaded." *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 284; 602 NW2d 854 (1999), citing MCR 2.111(B)(1). Further, the trial court specifically denied defendant's request and did not instruct the jury to treat this matter as a lost opportunity claim.

The lost opportunity doctrine is not applicable in this case because, as noted by our Supreme Court in *Stone v Williamson*, 482 Mich 144, 152; 753 NW2d 106 (2008), the " 'theory is potentially available in situations where a plaintiff cannot prove that a defendant's actions were the cause of his injuries, but can prove that the defendant's actions deprived him of a chance to avoid those

injuries.' " (Citation omitted.) In this instance, as in *Stone*, "it is clear from the way the instructions were given that the jury found that the traditional elements were met: defendants' negligence more probably than not caused plaintiff's injuries. Thus, . . . the jury properly found that plaintiff had satisfied the causation and injury elements." *Id.* at 163.

On appeal, defendant raises a related issue pertaining to the trial court's permitting plaintiff's expert to testify regarding the lost opportunity doctrine, asserting that Dr. Flanigan's opinion did not meet the reliability criteria of MCL 600.2955 because he did not cite or rely on professional treatises or publications. In part, we need not address this issue because it is rendered moot by the very fact that the case did not proceed under the loss of opportunity doctrine and Dr. Flanigan's testimony was consistent with proofs to establish the elements of negligence.

MRE 702 governs the admission of expert testimony, stating:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This Court, in *Surman v Surman*, 277 Mich App 287, 308; 745 NW2d 802 (2007), identified the criteria for the admission of expert testimony as including the requirements that

> (1) the witness be an expert, (2) there are facts in evidence that require or are subject to examination and analysis by

a competent expert, and (3) the knowledge is in a particular area that belongs more to an expert than to the common man. The party presenting the expert bears the burden of persuading the trial court that the expert has the necessary qualifications and specialized knowledge that will aid the fact-finder in understanding the evidence or determining a fact in issue. A witness may be qualified as an expert by knowledge, skill, experience, training, or education. [Citations omitted.]

Defendant does not dispute Dr. Flanigan's qualifications pursuant to MCL 600.2169. MCL 600.2955(3) specifically indicates that the provisions of MCL 600.2955 "are in addition to, and do not otherwise affect, the criteria for expert testimony provided in [MCL 600.2169]."

Ostensibly, by suggesting that Dr. Flanigan's opinion is not admissible under MCL 600.2955, defendant is confusing the admissibility of the testimony with the weight to be attributed to the expert's opinion. Specifically,

when determining whether a witness is qualified as an expert, the trial court should not weigh the proffered witness's credibility. Rather, a trial court's doubts pertaining to credibility, or an opposing party's disagreement with an expert's opinion or interpretation of facts, present issues regarding the weight to be given the testimony, and not its admissibility. " 'Gaps or weaknesses in the witness' expertise are a fit subject for cross-examination, and go to the weight of his testimony, not its admissibility.' " The extent of a witness's expertise is usually for the jury to decide. [*Surman, supra* at 309-310 (citations omitted).]

Hence, defendant's criticism regarding the scientific or theoretical basis for Dr. Flanigan's opinion is more properly confined to challenge during cross-examination rather than attempting to invalidate his overall qualification.

### C. EVIDENTIARY ERRORS

Defendant contends the trial court erred by permitting lay witnesses to testify regarding plaintiff's integrity or character. Plaintiff responds that admission of the testimony was necessary and responsive to a surveillance video submitted into evidence by defendant, which implied that plaintiff was not truthful regarding the effect of his alleged injuries.

Specifically, MRE 608(a) provides:

> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may only refer to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

At trial, defendant offered a surveillance video, without testimony or commentary, showing plaintiff engaged in certain activities. Purportedly, the video demonstrated that, contrary to plaintiff's assertions, he was capable of engaging in certain activities and was not as physically limited as alleged in his complaint. The video impliedly impugned plaintiff's truthfulness, as it suggested that plaintiff's residual injuries were not as extensive or limiting as alleged. MRE 608(a)(2) permits opinion testimony regarding a plaintiff's character for truthfulness "only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence *or otherwise*." (Emphasis added.) In this instance the testimony went beyond plaintiff's reputation for truthfulness and encompassed plaintiff's overall "integrity."

Although the trial court erred by permitting this testimony, we conclude that any such error was harm-

less. "Error in the admission of evidence is not cause for reversal unless it affects a substantial right of the party opposing admission." *Stitt v Holland Abundant Life Fellowship (On Remand)*, 243 Mich App 461, 469; 624 NW2d 427 (2000); see also MRE 103(a). Notably, the issue in dispute was the extent of plaintiff's residual injuries and their effect on his functioning. Both parties had the opportunity through testimony and other evidence, such as the surveillance video, to support their arguments and contentions. Hence, there existed sufficient evidence for the jury to determine plaintiff's residual impairments irrespective of testimony regarding plaintiff's integrity. In addition, much of the testimony elicited from these witnesses was factual regarding their observations of plaintiff while volunteering at his church, which served as the background for part of the surveillance video. These witnesses were able to provide some context or explanation for the images submitted by defendant. When considered in conjunction with the instructions to the jury admonishing them to determine the credibility and weight to be afforded any witness's testimony "and the reasonableness of the testimony considered in the light of all of the evidence," any error in permitting the challenged testimony was harmless.

On cross-appeal, plaintiff challenges the trial court's grant of summary disposition in favor of Dr. Eggert. Specifically, plaintiff contends the trial court erred by dismissing the claims following its refusal to consider testimony by various members of plaintiff's family that the nursing staff had indicated that Dr. Eggert had been unresponsive to their calls and pages, in violation of the standard of care. Defendant asserts that the trial court properly excluded this testimony as inadmissible hearsay and because of the absence of any documentation or testimony indicating that the evidence would affect or

alter the opinion of plaintiff's expert regarding Dr.
Eggert's breach of the standard of care.

The claims against Dr. Eggert were dismissed be-
cause of the opinion of plaintiff's expert, Dr. Flanigan,
that the surgeon had not breached the applicable stan-
dard of care regarding the treatment provided. Dr.
Flanigan did indicate that the only possible breach by
Dr. Eggert would have been if he had not responded in
a timely manner to a communication by the nursing
staff. Subsequently, depositions were conducted of
plaintiff's wife, son, and daughters, and they recalled
comments by PACU nursing staff after the first surgery
suggesting that they encountered difficulties in reach-
ing or communicating with Dr. Eggert regarding plain-
tiff's condition while in the unit. Specifically, plaintiff's
son recalled the nursing staff indicating they were
trying to reach Dr. Eggert, but could not recall a time
frame between these comments and the physician's
arrival at the PACU. Plaintiff's daughters testified in a
similar manner, asserting that the nursing staff indi-
cated they were experiencing difficulty in contacting Dr.
Eggert regarding control of plaintiff's pain and that on
the day after the second surgery, one of the nursing staff
indicated when trying to contact Dr. Eggert that she
received a busy signal and had to request the operator
to "break on the line for an emergency." Plaintiff's wife
testified in a similar manner but reported that the
comments by the nurses occurred at approximately 8:00
p.m. and that Dr. Eggert appeared in the PACU within
30 minutes of these comments. Contrary to this testi-
mony, all the nursing staff involved and Dr. Eggert
denied encountering any delay in reaching him. They
specifically disavowed having to use a telephone opera-
tor to break into his phone line, and there was no
commensurate documentation indicating either the
need for ongoing efforts to contact or difficulty in

contacting the physician. Defendant further asserted that even if plaintiff were able to demonstrate the nursing staff encountered difficulty in contacting Dr. Eggert, there was insufficient proof regarding the amount of time involved to establish a breach of the standard of care.

MRE 801(c) defines "hearsay" as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is inadmissible except as delineated within the rules of evidence. MRE 802. While the alleged statements by the nurses unquestionably comprise hearsay, plaintiff contends they were admissible pursuant to either MRE 803(1), as present sense impressions, or MRE 803(3), as statements of a then existing mental, emotional, or physical condition.

A present sense impression, defined as a "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter," is not precluded by the hearsay rule. MRE 803(1). The availability of this exception relies on the trustworthiness of the statement, which is based on the substantially contemporaneous nature of the statement with the underlying event. *People v Hendrickson*, 459 Mich 229, 235; 586 NW2d 906 (1998). For hearsay evidence to be admissible under this exception, three criteria must be met: "(1) the statement must provide an explanation or description of the perceived event, (2) the declarant must personally perceive the event, and (3) the explanation or description must be 'substantially contemporaneous' with the event." *Id.* at 236. Contrary to plaintiff's contention, it is not clear from the record that the alleged statements by the nursing staff were

substantially contemporaneous with the purported difficulties encountered in contacting Dr. Eggert. Specifically, the comments made on the day following the second surgery are clearly precluded because of the failure to establish temporal proximity with the alleged events. In addition, in order to establish the foundation for the admission of a hearsay statement pursuant to the present sense impression exception, other evidence corroborating the statement must be brought forth to ensure its reliability. *Id.* at 238. In this instance, there is neither documentary evidence nor verbal testimony to corroborate the alleged statements.

Plaintiff further contends that the alleged statements are alternatively admissible under MRE 803(3), which provides:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Although plaintiff contends that MRE 803(3) is applicable, he fails to cite any law or expound on his assertion. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give issues cursory treatment with little or no citation of supporting authority." *Houghton v Keller*, 256 Mich App 336, 339; 662 NW2d 854 (2003) (citation omitted). Because plaintiff failed to properly address the merits of his assertion of error regarding this evidentiary provision, we consider the issue abandoned. *Id.* at 339-340.

Despite plaintiff's failure to properly present this issue for appellate consideration, we note that "the

scope of MRE 803(3) is very narrow . . . ." *UAW v Dorsey (On Remand)*, 273 Mich App 26, 38; 730 NW2d 17 (2007). Because the alleged statements do not reflect the declarants' state of mind, but merely serve to explain a past sequence of events or behavior, the statements are specifically excluded from the exception and not admissible.

### D. CURATIVE INSTRUCTION

Defendant contends the trial court erred by failing to give a curative instruction regarding a misrepresentation of law by plaintiff's counsel. Specifically, defendant argues that while questioning Nurse Piatt and nursing expert Janet McCoig, plaintiff's counsel improperly implied to the jury that the nursing staff had violated statutory law by failing to document on the medication administration record (MAR) the administration of certain medications. The challenged exchange pertaining to Nurse Piatt focused on the failure to document on the MAR the administration of an epidural narcotic:

> *Q.* And what this is, is whenever you give a medication to the patient, in this case Mr. Ykimoff, you are required by law to write it down in this medication record?
>
> *A.* Yes.

Plaintiff's counsel continued to challenge both Nurse Piatt and Nurse Desmarais regarding deficiencies or inconsistencies in their charting for this patient. However, defendant did not object to the testimony until plaintiff's counsel questioned Janet McCoig and elicited the following:

> *Q.* Are nurses required to put in the MAR the medications by law?
>
> *A.* Yes, sir—

Subsequently, extended discourse occurred between counsel and the trial court, outside the presence of the jury, seeking to clarify the "law" being referenced, which plaintiff's counsel never identified or provided to the trial court. Defense counsel sought a curative instruction, pursuant to MCR 2.516(C), which the trial court denied, basing the denial, in part, on the mistaken belief that the discussion regarding the status or existence of such a law had occurred in the presence of the jury.

MCR 2.516(C) provides:

> A party may assign as error the giving of or the failure to give an instruction only if the party objects on the record before the jury retires to consider the verdict (or, in the case of instructions given after deliberations have begun, before the jury resumes deliberations), stating specifically the matter to which the party objects and the grounds for the objection. Opportunity must be given to make the objection out of the hearing of the jury.

Properly preserved assertions of instructional error are reviewed de novo. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 8; 651 NW2d 356 (2002). "[A] verdict should not be set aside unless failure to do so would be inconsistent with substantial justice. Reversal is not warranted when an instructional error does not affect the outcome of the trial." *Jimkoski v Shupe*, 282 Mich App 1, 9; 763 NW2d 1 (2008).

The focus of questioning by plaintiff's counsel was to demonstrate negligence by the nursing staff in failing to recognize the postsurgery formation of a blood clot and to notify the surgeon in a timely manner. To this end, counsel intensely questioned the nursing staff regarding their charting of plaintiff's condition and treatments administered in an effort to demonstrate their awareness of various symptoms indicating the forma-

tion of a clot at various temporal points during plaintiff's stay in the PACU. Whether the charting deficiencies by the nurses comprised a statutory violation was irrelevant. The references to legal requirements for charting medications were cursory and constituted only a very small part of plaintiff's argument, making it unlikely that these references influenced or caused the jury's verdict against defendant. Defendant's reliance on *Shreve v Leavitt*, 51 Mich App 235; 214 NW2d 739 (1974), is misplaced. In *Shreve* the misstatement of law pertained to the issue of proximate cause and affected a crucial question confronted by the jury. *Id.* at 241. In this instance, whether failure to document or chart medication on a particular form violated a law or nursing regulation was not integral to demonstrating defendant's negligence or proximate cause.

Further, the trial court instructed the jury, "The law that you are to apply to this case is contained in these instructions and it is your duty to follow them" and that statements by the attorneys did not comprise evidence and that the jury "should disregard anything said by an attorney that is not supported by evidence . . . ." Because jurors are presumed to follow their instructions, any failure to provide a curative instruction was harmless. *Bordeaux v Celotex Corp*, 203 Mich App 158, 164; 511 NW2d 899 (1993).

### E. NONECONOMIC DAMAGES CAP

In a medical malpractice action, MCL 600.1483 controls an award of damages for noneconomic loss. Specifically, MCL 600.1483(1) provides:

> In an action for damages alleging medical malpractice by or against a person or party, the total amount of damages for noneconomic loss recoverable by all plaintiffs, resulting from the negligence of all defendants, shall not

exceed $280,000.00 unless, as a result of the negligence of 1 or more of the defendants, 1 or more of the following exceptions apply as determined by the court pursuant to [MCL 600.6304], in which case damages for noneconomic loss shall not exceed $500,000.00:

(a) The plaintiff is hemiplegic, paraplegic, or quadriplegic resulting in a total permanent functional loss of 1 or more limbs caused by 1 or more of the following:

(*i*) Injury to the brain.

(*ii*) Injury to the spinal cord.

(b) The plaintiff has permanently impaired cognitive capacity rendering him or her incapable of making independent, responsible life decisions and permanently incapable of independently performing the activities of normal, daily living.

(c) There has been permanent loss of or damage to a reproductive organ resulting in the inability to procreate.

For purposes of this case, only the trial court's determination that MCL 600.1483(1)(c) was applicable is being considered.

The trial court permitted use of the upper tier of the damages cap on the basis of plaintiff's claim that he suffered from erectile dysfunction as a result of defendant's negligence, which resulted in his "inability to procreate." Defendant contends that plaintiff's erectile dysfunction was a condition that existed before the surgery and points to the lack of medical evidence to support this claim. Resolution of this matter turns on both the statutory language of the damages cap provision and the failure of plaintiff to come forward with any medical evidence to support its application under the circumstances of this case.

The goal of statutory interpretation is to give effect to the intent of the Legislature. *Diamond v Witherspoon*, 265 Mich App 673, 684; 696 NW2d 770 (2005). If

statutory language "is clear and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written." *Id.* (quotation marks and citations omitted.) " '[A] court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself.' " *Thorn v Mercy Mem Hosp Corp*, 281 Mich App 644, 649; 761 NW2d 414 (2008) (citation omitted). MCL 600.1483(1)(c) requires, for application of the upper tier damages cap, that "permanent loss of or damage to a reproductive organ resulting in the inability to procreate" must have occurred. "Procreate" is defined in *Random House Webster's College Dictionary* (1997) as follows: "[as a transitive verb] 1. to beget or generate (offspring). 2. to produce; bring into being. [an intransitive verb] 3. to beget offspring." In contrast, the definition of "erectile dysfunction" is "chronic inability to achieve or maintain an erection satisfactory for sexual intercourse[.]"[5] Significantly, the definition for "erectile dysfunction" does not equate with a level of impairment sufficient to meet the statutory requirement of an "inability to procreate" for purposes of applying the higher damages cap. While the level or severity of plaintiff's condition may interfere with his ability to engage in sexual intercourse, there is no demonstration that this condition precludes his ability to "beget offspring." In addition, the statute specifically requires "permanent loss of or damage to a reproductive organ . . . ." Plaintiff does not assert damage to a reproductive organ. Rather, he asserts ischemic damage to the lumbosacral plexus nerves, affecting the pelvic area, which has allegedly resulted in the loss of sensation and inability to achieve

---

[5] *Merriam-Webster's Medical Dictionary*, available at Merriam-Webster OnLine <http://www.merriam-webster.com> (accessed March 20, 2009).

or maintain an erection. While the alleged injury may affect the ability to engage in sexual intercourse, by definition plaintiff's claim does not encompass the "permanent loss of or damage to a reproductive organ," as required by MCL 600.1483(1)(c).

Notably, the only testimony elicited regarding plaintiff's condition came from plaintiff and his wife. There was no definitive medical evidence that linked plaintiff's alleged condition to the surgery and also served to verify an inability to procreate. In fact, plaintiff acknowledged that he suffered from erectile dysfunction for a period of time before the surgery, albeit to a lesser degree. Although plaintiff previously consulted a physician regarding medical intervention for this condition, he ultimately declined the recommended treatments or pharmaceutical options. In addition, the presence of other preexisting medical conditions, such as high blood pressure and diabetes, and how they might have contributed to plaintiff's condition were not addressed as factors in this diagnosis. Although plaintiff's wife testified that intimate relations with her husband were affected, we find it contradictory that a claim for loss of consortium did not accompany this complaint. There is evidence that plaintiff enjoyed the ability to procreate earlier in his life, having fathered 11 children. However, no commensurate medical evidence was proffered to establish that his ability to procreate was absolutely precluded as the result of this surgery. As such, the trial court erred by using this exception in the calculation of noneconomic damages.

In addition, plaintiff has raised several additional issues on cross-appeal that depend on this Court's determination that a new trial is warranted. Because we do not find it necessary to remand this matter for a new trial, this Court need not address those remaining issues.

### V. RESPONSE

I understand the divergent perspectives of my colleagues regarding the application of *Martin*, but believe it is imperative that we not unnecessarily confuse the issue in this case and that we make a concerted effort to provide as clear a rule or guidance as possible to courts facing similar issues. Although I agree with the concerns regarding the potential for oversimplification and improper application of this Court's ruling in *Martin*, I feel similarly burdened that the concurring opinions in this matter may serve to unnecessarily complicate rather than define the factors to be used by courts in making determinations in cases involving similar issues.

Specifically, I disagree with Judge GLEICHER's statement that "the credibility of the treating physician could be questioned for any reason, regardless of whether his conduct conformed with his words." *Post* at 122. Although I concur that a jury may accept or disregard testimony as the ultimate fact-finder, I do not agree that the fact-finder can ignore uncontroverted facts establishing the actual conduct or behavior of the physician. Further, I take issue with Judge GLEICHER's contention that this lead opinion has "entirely misconstrued the law" with regard to proximate cause as elucidated in *Skinner. Post* at 129. Judge GLEICHER asserts that in *Martin* and this case "record evidence created a question of fact regarding whether the plaintiffs sustained injury *because they did not receive timely postoperative surgery* . . . ." *Post* at 130 (emphasis in original). Merely because plaintiff's proffered expert testimony provides a possible explanation for the injury suffered is insufficient by itself to meet plaintiff's burden with regard to proximate causation. Consequently, I believe that the reasoning delineated in this

opinion is consistent with *Skinner* and that Judge GLEICHER's suggestion that we permit a jury to accept or reject as credible an expert's opinion, irrespective of a factual demonstration that a physician's "conduct conformed with his words" violates the proscriptions of *Skinner* against speculation and conjecture and does not address the issue at hand.

Finally, while I agree that the inclusion of a more extensive factual history in *Martin* would have been helpful in avoiding its potential misapplication, I disagree with the distinctions Judge GLEICHER attempts to draw between *Martin* and this case. While *Martin* referred heavily to the affidavits provided by the physicians, there did exist in *Martin* uncontroverted factual averments that the treating physician had not only reviewed the patient's chart but "was otherwise adequately apprised of developments . . . ." *Martin, supra* at 162. Hence, the failure of the physician in *Martin* to act, given the availability of information regarding his patient's condition, is distinguishable from the situation in this case, involving the absolute absence of such information by Dr. Eggert. Hence, Dr. Eggert's subsequent averments regarding his inaction and denial of an earlier basis for intervention comprise mere speculation and conjecture. I would emphasize that the focus in these types of cases is not merely on the predictable existence of conflicting expert opinions. Rather, it is the existence of uncontroverted facts detailing the actual behaviors of the physicians and their consistency or inconsistency with regard to the timing and receipt of information related to their patient's condition that permits a court to evaluate their subsequent averments pertaining to the effect or absence of treatment or interventions provided in determining whether a genuine issue of material fact and proximate cause are established.

VI. CONCLUSIONS

We affirm the trial court's denial of defendant's motion for a new trial or JNOV and the grant of summary disposition in favor of Dr. Eggert. We vacate that portion of the judgment pertaining to the award and remand the case to the trial court for recalculation of damages pursuant to the proper statutory provision of the medical malpractice damages cap. Pursuant to MCR 7.219(A), we conclude that neither side has sufficiently prevailed for purposes of taxation of costs. We do not retain jurisdiction.

BANDSTRA, J. (*concurring*). I concur with the lead opinion and write separately to explain my conclusion that this case is factually different from *Martin v Ledingham*, 282 Mich App 158; 774 NW2d 328 (2009), as well as my firm disagreement with the approach advocated in Judge GLEICHER's concurring opinion.

The record in this case establishes clearly that before his decision to undergo the bypass graft surgery, plaintiff was fully informed by Dr. David Eggert that the procedure was a serious matter that could well result in negative consequences no matter how carefully it was conducted. Nonetheless, plaintiff decided to take the risks necessarily attendant to the surgery and, as alleged in his complaint, he experienced postsurgical problems that have led to this lawsuit.

Of course, the mere fact of injury does not suffice to impose liability against the hospital (defendant) in this malpractice lawsuit. Instead, plaintiff must establish that his injuries "were the proximate result" of defendant's failure to comply with an appropriate standard of care. *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). As part of this required "proximate cause" proof, plaintiff had to come forward with evi-

dence showing that "[a]s a matter of logic, . . . defendant's negligence was a cause in fact of . . . plaintiff's injuries . . . ." *Id.* at 87.

Much like *Martin*, this case involves the allegation that, had defendant's nurses better informed Eggert regarding plaintiff's postoperative condition, he would have taken different actions, which would have mitigated plaintiff's injuries. In *Martin*, we properly concluded that the plaintiff had failed to come forward with sufficient evidence that the nurses' alleged failure to report to the doctors was, as a matter of logic, a cause in fact of any injury to the plaintiff. To the contrary, the only evidence pertaining to that logical connection directly refuted it. The doctors unequivocally stated that even if the nurses had made the reports that the plaintiff claimed were appropriate, they would have not altered their treatment of the plaintiff in response. Notwithstanding Judge GLEICHER's complaints, *Martin* did nothing more than recognize that the plaintiff had the burden to establish a logical connection between the alleged negligence and the alleged injury. The plaintiff having failed to do so, *Martin* naturally concluded that summary disposition was warranted.

In the case before us today, evidence was presented from which a rational fact-finder could conclude that there was a logical connection between the alleged negligence and the alleged injury. As did the doctors in *Martin*, Eggert stated that had he received better and more complete reports from defendant's nurses regarding plaintiff's postoperative condition, he would not have altered his treatment in response. Nonetheless, as explained in the lead opinion, Eggert's testimony was replete with caveats and admissions from which the jury could reasonably conclude that, in fact, better and more complete reporting might well have led him to

respond more aggressively to plaintiff's problems.[1] In that sense, the burden of proving a possible logical cause-in-fact connection between the nurses' reports and plaintiff's injury was satisfied.[2]

Judge GLEICHER's opinion seems to completely absolve a plaintiff from any burden to come forward with affirmative cause-in-fact evidence in support of a malpractice claim. As I understand the argument, liability could be imposed even though all the evidence presented directly refutes a logical finding of cause in fact because that evidence is subject to disbelief by the finder of fact. In other words, as Judge GLEICHER would have it, a plaintiff could bring a case to the fact-finder without any evidence to support a logical finding of cause in fact, merely in the hope that the fact-finder would disbelieve evidence establishing that no logical cause in fact existed.

That would certainly be a novel approach inconsistent with the usual understanding of a plaintiff's burden of proof. It would also subvert the usual summary disposition rule that protects a defendant from litigation if "there is no genuine issue" on an element of a plaintiff's claim. MCR 2.116(C)(10). Even if the only available evidence undermines a plaintiff's claim, Judge

---

[1] The evidence of a logical cause in fact here was certainly not strong; it merely rose minimally to a level where a genuine issue was presented for the fact-finder's determination.

[2] As in *Martin, supra* at 161-162, the opinion of plaintiff's expert here about what Eggert should have done had he received better reports from the nurses is irrelevant. The logical cause-in-fact element of plaintiff's claim can be satisfied only by evidence showing what Eggert would, in fact, have done had different reports been provided, without regard whatsoever to any hypothetical obligations he may have had under an applicable standard of care. Such a standard of care evidence would, of course, be relevant in a different case—if Eggert, having received better reports from the nurses, was being sued for failing to undertake a different treatment in response.

GLEICHER would still apparently find a genuine issue arising from the possibility that the fact-finder could disbelieve that evidence.

The radical approach advocated by Judge GLEICHER would be directly contrary to the long stated rule that "it is not a legitimate inference to draw from testimony denying the existence of a fact sought to be proved, that such denial is evidence that the fact exists." *Quinn v Blanck*, 55 Mich 269, 272; 21 NW 307 (1884). Judge GLEICHER selectively quotes from a number of Michigan precedents that are portrayed as being contrary to this commonsensical *Quinn* rule. However, none of those precedents allowed a plaintiff merely to rely on evidence contrary to a proposition in order to establish that proposition. Instead, each case involved factual disputes based on contradictory evidence and, unremarkably, those disputes were allowed to go to the fact-finder for determination.[3]

---

[3] In *Woodin v Durfee*, 46 Mich 424, 427; 9 NW 457 (1881), only "most of" the facts surrounding the execution of a bond were undisputed. The rest of the facts, apparently to be deduced from the testimony of seven people involved in the execution of the bond, "were not conceded or beyond dispute." *Id.* While the Supreme Court opined that the account of the bond's execution favoring the claimant "probably ought to have satisfied any one," it further concluded that this determination was properly in the hands of the jury considering the apparently varying evidence. *Id.* Similarly, in *Cuttle v Concordia Mut Fire Ins Co*, 295 Mich 514, 519; 295 NW 246 (1940), the Supreme Court determined that a factual question existed for jury determination when testimony by a person that he had mailed a notice, while "not directly contradicted," was inconsistent with evidence from a principal of the person's employer concerning the manner in which the notice had been sent, as well as evidence that various recipients of the notice had complaints regarding the receipt of the notice. Again, in *Arndt v Grayewski*, 279 Mich 224, 230; 271 NW 740 (1937), the Supreme Court unremarkably concluded that a factual question existed for jury determination when the testimony of an eye-witness to an accident was "disputed by the physical facts, and seriously questioned by the testimony of one of the defendants . . . ." *Morgan v Engels*, 372 Mich 514; 127 NW2d 382 (1964), involved a routine

Further, the most recent of these precedents, *Taylor v Mobley*, 279 Mich App 309, 313; 760 NW2d 234 (2008), was not a case like the present one, in which a plaintiff burdened with the responsibility to present evidence in support of a claim arguably failed to do so. The plaintiff in *Taylor* presented her own testimony in support of the contested noneconomic damages element of her claim. Accordingly, *Taylor* did not present any argument similar to the one we address here about a failure to properly shoulder a burden of proof; *Taylor* is completely inapposite.

And, finally, Judge GLEICHER's "additional concerns" with this opinion are simply unfounded. *Post* at 132. They are based on a failure to recognize that my analysis rests on the fact that our law places a burden of proof on a plaintiff seeking to recover damages. Thus, a plaintiff failing to come forward with any evidence in support of an element of a claim is properly subject to summary disposition for failing to shoulder that burden of proof. In other words, a plaintiff is penalized for failing to come forward with evidence precisely because the law imposes a burden of proof on a plaintiff.[4] That

---

malpractice suit dispute between a doctor who claimed he had not violated any standard of practice and an expert witness who testified that he had. In *Strach v St John Hosp Corp*, 160 Mich App 251, 270-271; 408 NW2d 441 (1987), a factual question was presented when a doctor's testimony that he had informed the plaintiffs that he was an independent contractor was contradicted by the plaintiffs' testimony that they did not recall so being told. And, finally, in *Taylor v Mobley*, 279 Mich App 309, 313; 760 NW2d 234 (2008), our Court held that a jury could disbelieve a plaintiff's account of extreme pain and suffering where there was "countervailing evidence that undermined plaintiff's credibility," testimony that "plaintiff appeared to be only in 'a little bit of pain' immediately after" the dog bite giving rise to the action, and other contradictory evidence.

[4] Of course, this same analysis applies to any party, not just a plaintiff, who bears a burden of proof. For example, in many areas of our law, the burden of presenting proof of a defense is imposed on a defendant once a

same analysis does not apply to a party on which no burden of proof is imposed. And thus, Judge GLEICHER's conclusion that the rule requiring a plaintiff to present evidence in support of a claim means that a plaintiff who does so is entitled to summary disposition is logically unfounded.

GLEICHER, J. (*concurring*). I concur with the lead opinion that the trial court properly denied defendant W. A. Foote Memorial Hospital's motion for judgment notwithstanding the verdict or a new trial and correctly granted summary disposition to defendant Dr. David Eggert. I further agree that the higher medical malpractice damages cap in MCL 600.1483(1)(c) does not apply to the facts of this case. I write separately to express disagreement with the proposition that this case is logically distinguishable from *Martin v Ledingham*, 282 Mich App 158; 774 NW2d 328 (2009).

The lead opinion rejects the hospital's contentions that plaintiff failed to create a genuine issue of fact concerning causation, concluding that because the jury remained free to disbelieve Dr. Eggert's testimony, "the matter was properly submitted to the jury for resolution." *Ante* at 94. Judge BANDSTRA's concurring opinion posits that Dr. Eggert's testimony "was replete with caveats and admissions" that allowed the jury to determine that "better and more complete reporting might well have led" to more aggressive treatment of plaintiff's problems. *Ante* at 116. Both the lead opinion and Judge BANDSTRA's concurring opinion assert that the weaknesses inherent in Eggert's testimony completely distinguish this case from *Martin*. I respectfully

plaintiff presents a prima facie case in support of a claim. If a defendant fails to come forward with any evidence in support of a defense to the claim, the plaintiff is entitled to summary disposition.

disagree. In my view, "the jury is free to credit or discredit *any* testimony." *Kelly v Builders Square, Inc*, 465 Mich 29, 39; 632 NW2d 912 (2001) (emphasis added). Moreover, I believe that this Court incorrectly decided *Martin*.

### I. *MARTIN'S* SIMILARITY TO THIS CASE AND ITS DISREGARD OF THE JURY'S FACT-FINDING PREROGATIVE

In *Martin*, this Court confronted a factual situation strikingly similar to the instant case. The plaintiff in *Martin* asserted that the nurses breached the applicable standard of care by failing to apprise the plaintiff's surgeon of her worsening postsurgical condition. The plaintiff's surgeons submitted affidavits in support of summary disposition pursuant to MCR 2.116(C)(10), alleging "that they would not have changed the course of plaintiff's treatment had nurses employed by defendant informed them of plaintiff's condition as plaintiff alleged they should have." *Martin*, 282 Mich App at 159. The plaintiff submitted evidence "showing that, had the nurses properly reported, a notified doctor would have had the duty to change plaintiff's treatment." *Id.* at 160. In affirming summary disposition for the defendant hospital, the Court in *Martin* considered the surgeons' affidavits and ultimately rejected the notion that a fact-finder could determine that cause in fact existed "merely because the fact-finder disbelieved the doctors involved . . . ." *Id.* at 163. The Court reasoned, "This evidence was insufficient to create a genuine issue on factual causation because it only concerned what hypothetical doctors should have done had better reports been provided." *Id.* at 161-162. According to *Martin, id.* at 163-164, a jury's disbelief of the doctors actually involved in a plaintiff's care would result in an inherently speculative finding of causation, directly contravening

our Supreme Court's holding in *Skinner v Square D Co*, 445 Mich 153, 164; 516 NW2d 475 (1994).

No meaningful distinction exists between the causation proofs presented in *Martin* and those introduced during the trial of this case. I respectfully reject the lead opinion's reasoning that "[i]n *Martin*, the credibility of the treating physician was not called into question both because he was kept apprised of his patient's condition on an ongoing basis and because his actual behavior regarding medical intervention completely coincided with his subsequent assertions." *Ante* at 94. In my view, the credibility of the treating physician could be questioned for any reason, regardless of whether his conduct conformed with his words.

In *Martin*, the surgeons' affidavits set forth *opinions* regarding (1) the extent or quantity of their knowledge regarding the plaintiff's condition ("[Dr.] Rynbrandt repeatedly stated that he had *ample* information regarding plaintiff and her situation . . . . ") and (2) the quality of their knowledge ("[H]e reviewed plaintiff's chart and was otherwise *adequately* apprised of developments . . . . "). *Martin*, 282 Mich App at 162 (emphasis added). Dr. Rynbrandt's affidavit further opined that "nothing the nurses could have done differently would have altered the care that he provided plaintiff." *Id.*

The lead opinion asserts, "The very fact-intensive nature of the ruling in *Martin* necessarily leads to concern regarding the broader applicability of that decision . . . ." *Ante* at 90. But *Martin* contains woefully few facts. The lead opinion attempts to distinguish *Martin* by emphasizing that the affiant surgeons in that case actually behaved in accordance with the words recited in their affidavits. But that is not what the case says, and I am at a loss to read facts into *Martin* that simply do not exist. Had the surgeons in *Martin* been

present at the patient's bedside when the plaintiff claimed that intervention should have occurred, I daresay their affidavits would have so reflected. Instead, the affidavits assert the same reasoning adopted by Dr. Eggert: "that they would not have changed the course of plaintiff's treatment *had nurses employed by defendant informed them of plaintiff's condition as plaintiff alleged they should have.*" *Martin*, 282 Mich App at 159 (emphasis added). *Martin* neither examined nor referred to the "actual behavior" of the treating physicians. I simply find no basis in *Martin* for the lead opinion's determination that the physician's behavior in that case "completely coincided with his subsequent assertions." *Ante* at 94.

According to the lead opinion, "the physician in *Martin*, in averring that the nursing staff could not have done anything differently to affect his treatment decision, was describing his actual analysis of the presenting situation and subsequent action or inaction and was neither speculating nor relying on hindsight." *Ante* at 91. I respectfully disagree. The affidavits submitted in *Martin* embodied opinion testimony addressing the character of the affiants' knowledge and the manner in which they would have responded if the nurses had provided "better reports." *Martin*, 282 Mich App at 161-162. Rather than reporting firsthand knowledge obtained from actual observations of the plaintiff contemporaneous with the nursing observations, the affidavits recited the affiants' speculation about what they would have done under circumstances that did not actually exist. In essence, the surgeons' affidavits qualified as answers to the hypothetical question, What would you have done had the nurses behaved in the manner described by the plaintiff's nursing expert? In my view, this evidence was actually more speculative and less reliable than testimony describing the stan-

dard of care, which must conform to the rigorous requirements of MRE 702 and 703. The plaintiff's expert testimony called into question the credibility of the surgeons' affidavits by asserting that the standard of care applicable to the affiants required swifter intervention. If the jury believed the plaintiff's experts in this regard, it should then have determined whether to believe that the surgeons would have breached the standard of care.

Because the affidavits in *Martin* provided opinions rather than facts, the credibility of their signers should have been explored at a trial. It is for this central reason that I disagree with the holding in *Martin* that the affidavits supplied a *factual* basis for summary disposition. Although Judge BANDSTRA characterizes as "radical" my approach to this issue, *ante* at 118, I propose nothing new. More than a century ago, the United States Supreme Court concisely articulated the foundation for the principle that a witness's credibility always remains subject to a jury's consideration:

> The jury were the judges of the credibility of the witnesses . . . , and in weighing their testimony had the right to determine how much dependence was to be placed upon it. There are many things sometimes in the conduct of a witness upon the stand, and sometimes in the mode in which his answers are drawn from him through the questioning of counsel, by which a jury are to be guided in determining the weight and credibility of his testimony. That part of every case . . . belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men; and so long as we have jury trials they should not be disturbed in their possession of it, except in a case of manifest and extreme abuse of their function. [*Aetna Life Ins Co v Ward*, 140 US 76, 88; 11 S Ct 720; 35 L Ed 371 (1891).]

Numerous cases demonstrate that until *Martin*, Michigan's appellate courts had consistently adhered to the core principles, derived from *Aetna Life Ins Co* and similar cases,[1] that (1) every witness's testimony is subject to disbelief by the finder of fact and (2) a court may not usurp the jury's prerogative to accept or reject any testimony.

For example, in *Woodin v Durfee*, 46 Mich 424, 427; 9 NW 457 (1881), our Supreme Court reversed the grant of a verdict directed by the trial court on the basis of "undisputed" evidence that "probably ought to have satisfied any one . . . ." Writing for a unanimous Court, Justice COOLEY explained that despite the absence of any conflicting evidence, the jury "may disbelieve the most positive evidence, even when it stands uncontra-

---

[1] The core principles underpinning the caselaw cited throughout this concurring opinion emanate from the Seventh Amendment of the United States Constitution. See also *The Conqueror*, 166 US 110, 133; 17 S Ct 510; 41 L Ed 937 (1897), stating that the "ultimate weight to be given to the testimony of experts is a question to be determined by the jury; and there is no rule of law which requires them to surrender their judgment, or to give a controlling influence to the opinions of scientific witnesses," and *Head v Hargrave*, 105 US 45, 49; 26 L Ed 1028 (1881), stating:

It was the province of the jury to weigh the testimony of the attorneys as to the value of the services, by reference to their nature, the time occupied in their performance, and other attending circumstances, and by applying to it their own experience and knowledge of the character of such services. To direct them to find the value of the services from the testimony of the experts alone, was to say to them that the issue should be determined by the opinions of the attorneys, and not by the exercise of their own judgment of the facts on which those opinions were given. The evidence of experts as to the value of professional services does not differ, in principle, from such evidence as to the value of labor in other departments of business, or as to the value of property. So far from laying aside their own general knowledge and ideas, the jury should have applied that knowledge and those ideas to the matters of fact in evidence in determining the weight to be given to the opinions expressed; and it was only in that way that they could arrive at a just conclusion.

dicted; and the judge cannot take from them their right of judgment." *Id*. Our Supreme Court again emphasized that a witness need not be believed in *Yonkus v McKay*, 186 Mich 203, 210-211; 152 NW 1031 (1915), stating:

> To hold that in all cases when a witness swears to a certain fact the court must instruct the jury to accept that statement as proven, would be to establish a dangerous rule. Witnesses sometimes are mistaken and sometimes unfortunately are wilfully mendacious. The administration of justice does not require the establishment of a rule which compels the jury to accept as absolute verity every uncontradicted statement a witness may make.

In *Cuttle v Concordia Mut Fire Ins Co*, 295 Mich 514, 519; 295 NW 246 (1940), the Supreme Court again acknowledged that "[u]ncontradicted testimony may be disentitled to conclusiveness because, from lapse of time or other circumstances, it may be inferred that the memory of the witness is imperfect as to the facts to which he testified, or that he recollects what he professes to have forgotten." *Id*. See also *Arndt v Grayewski*, 279 Mich 224, 231; 271 NW 740 (1937), holding that eyewitness testimony "is not conclusive upon the court or a jury if the facts and circumstances of the case are such as irresistibly lead the mind to a different conclusion."

Citing *Baldwin v Nall*, 323 Mich 25, 29; 34 NW2d 539 (1948), this Court held in *Strach v St John Hosp Corp*, 160 Mich App 251, 271; 408 NW2d 441 (1987), that a jury could disregard a physician's unrebutted testimony, reasoning that "a jury may disbelieve the most positive evidence even when it stands uncontradicted, and the judge cannot take from them their right of judgment[.]" More recently, in *Taylor v Mobley*, 279 Mich App 309, 314; 760 NW2d 234 (2008), this Court held that the jury justifiably rejected the plaintiff's

uncontradicted and unchallenged testimony regarding her personal pain and suffering after a dog bite. This Court observed that "the jury could have simply disbelieved and discredited plaintiff's testimony regarding pain and suffering." *Id.* The Court referred in a footnote to several additional cases standing for the proposition that "the jurors' prerogative to disbelieve testimony, including uncontroverted testimony, is well established." *Id.* at 314 n 5.

These cases underscore that despite Dr. Eggert's emphatic, unrebutted assertion that he would not have operated on plaintiff at 7:00 p.m. irrespective of what he may have learned from the nurses, the jury possessed the authority to disbelieve every word that Dr. Eggert uttered. The lead opinion asserts that Dr. Eggert's testimony was "speculative at best and self-serving at worst" and thus could be disregarded. *Ante* at 91. But in my view, these characterizations qualify as wholly irrelevant to the requisite focus of the analysis here. The caselaw discussed earlier posits that the jury can disregard testimony that, in the words of Justice COOLEY, "probably ought to have satisfied any one . . . ." *Woodin*, 46 Mich at 427. Regardless of whether this Court views the testimony of a treating physician as entirely rational and in accord with the medical records, or completely self-serving and verging on the absurd, a judge cannot remove from a jury its "right of judgment." *Strach*, 160 Mich App at 271. From the time of *Woodin*, through that of *Kelly*, the governing principle in Michigan has been that a jury possesses the freedom to disregard a witness's opinions for any reason, or for no discernible reason. That a jury has exercised this right does not render its proximate cause decision "speculative." Rather, the correct inquiry is whether sufficient record evidence demonstrates that the defendant's negligence was "a cause of plaintiff's injury, and . . . that

the plaintiff's injury . . . [was] a natural and probable result of the negligent conduct." M Civ JI 15.01.[2]

## II. IMPROPER FACT-FINDING BY THE *MARTIN* COURT IN THE CONTEXT OF SUMMARY DISPOSITION

This Court's decision in *Martin* contravenes another accepted jurisprudential rule. "It is well settled that where the truth of a material factual assertion of a moving party's affidavit depends on the affiant's credibility, there exists a genuine issue to be decided at trial by the trier of fact and a motion for summary disposition cannot be granted." *SSC Assoc Ltd Partnership v Detroit Gen Retirement Sys*, 192 Mich App 360, 365; 480 NW2d 275 (1991); see also *Arbelius v Poletti*, 188 Mich App 14, 18-19; 469 NW2d 436 (1991). However, in *Martin* this Court accepted as true the treating physicians' averments describing what they would have done had they received the reports by the nurses that the plaintiff alleged should have been made. The Court rejected the notion that record evidence, including the testimony of the plaintiff's expert witness that the additional reports would have shown the physicians that a different course of treatment was appropriate, sufficed to challenge the veracity of the treating physicians' contentions. Despite the apparent absence of any evidence rebutting the testimony of the plaintiff's expert, the Court in *Martin* found as fact that the treating physicians would not have changed the treatment if they had received additional reports. *Martin, supra* at 161-163.

---

[2] A trial court retains the authority to grant summary disposition if a medical malpractice plaintiff fails to present evidence documenting what a reasonable physician would have done under the same or similar circumstances or that an alternative course of conduct would likely have altered the plaintiff's outcome. Additionally, a trial court may analyze the evidence under MCR 2.611(A)(1)(e) to determine whether the "great weight of the evidence" supports the jury's proximate cause finding.

I believe that in light of *SSC Assoc Ltd Partnership* and a related line of established caselaw, this conclusion constitutes legal error and supplies a second ground warranting reconsideration of *Martin*.

### III. CAUSATION IN *MARTIN* AND THIS CASE

But the most troubling aspect of both *Martin* and this case concerns the meaning of proximate causation and the proper application of our Supreme Court's opinion in *Skinner*. A brief review of *Skinner* reveals that the lead opinion, Judge BANDSTRA's concurring opinion, and *Martin* have entirely misconstrued the law.

At the time of his death, the decedent in *Skinner* had been operating an electric metal "tumbling machine" of his own design and manufacture. *Skinner*, 445 Mich at 157. The plaintiffs theorized that defendant Square D Company defectively designed a switch that the decedent had incorporated in his tumbling machine. According to the plaintiffs, the "large 'phantom zone' " of the switch sometimes inaccurately signaled that the switch was "off" while power actually continued flowing to the machine. *Id.* at 158. Because no one witnessed the decedent's accident, no direct evidence existed demonstrating any relationship between the switch and the decedent's electrocution. The plaintiffs' case against Square D was entirely circumstantial, predicated on a mere assumption that the Square D switch had played a role in the decedent's death. *Id.* at 163. Furthermore, some of the physical evidence directly contradicted the hypothetical accident scenario proposed by the plaintiffs. *Id.* at 171-172. Square D maintained that even assuming the presence of a defect in its switch, the plaintiffs' circumstantial proofs failed to demonstrate that the decedent "was misled by the switch when he was fatally electrocuted." *Id.* at 158. The Supreme Court agreed, concluding that the record contained no

direct or circumstantial evidence from which a reasonable jury could infer the mechanism of the decedent's electrocution or whether the switch contributed to the accident. *Id.* at 174. The Supreme Court emphasized in *Skinner* that "[t]o be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Id.* at 164.

*Skinner* simply has no applicability here or to the situation presented in *Martin*. In both this case and *Martin*, record evidence created a question of fact regarding whether the plaintiffs sustained injury *because they did not receive timely postoperative surgery*; expert testimony in both cases demonstrated that "but for" the absence of timely surgical intervention, the plaintiffs would not have sustained injury. Unlike *Skinner*, in which no direct or circumstantial evidence connected the defect in the switch and the decedent's electrocution, admissible expert opinions in *Martin* and the instant case directly linked the plaintiffs' injuries to a delay in their second operations. And breaches of the nursing standard of care constituted a cause of that delay, according to the plaintiffs' evidence.

The plaintiffs' expert physicians here and in *Martin* thus supported the "but for" causation requirement with their testimony that if the plaintiffs had undergone earlier second surgeries, they would have recovered uneventfully. And most critically, the experts further opined that had the treating physicians been informed of their patients' worsening conditions, the standard of care would have required prompt second operations. A firm factual foundation supported the expert testimony supplied in both cases, providing admissible evidence from which a jury could conclude that a reasonably prudent physician would have taken the patients back to the operating room, thereby pre-

venting injury. While the plaintiffs in *Skinner* entirely
lacked evidence that the switch constituted a cause in
fact of the decedent's electrocution, the plaintiffs here
and in *Martin* produced evidence that the nurses'
negligence resulted in patient injury. This evidence
established cause in fact. See also *Craig v Oakwood
Hosp*, 471 Mich 67, 87-88; 684 NW2d 296 (2004):

> Generally, an act or omission is a cause in fact of an
> injury only if the injury could not have occurred without (or
> "but for") that act or omission. While a plaintiff need not
> prove that an act or omission was the *sole* catalyst for his
> injuries, he must introduce evidence permitting the jury to
> conclude that the act or omission was *a* cause.

> It is important to bear in mind that a plaintiff cannot
> satisfy this burden by showing only that the defendant *may*
> have caused his injuries. Our case law requires more than
> a mere possibility or a plausible explanation. Rather, a
> plaintiff establishes that the defendant's conduct was a
> cause in fact of his injuries only if he "set[s] forth specific
> facts that would support a reasonable inference of a logical
> sequence of cause and effect." A valid theory of causation,
> therefore, must be based on facts in evidence. And while
> " '[t]he evidence need not negate all other possible
> causes,' " this Court has consistently required that the
> evidence " 'exclude other reasonable hypotheses with a fair
> amount of certainty.' " [Citations omitted.]

Here and in *Martin*, the plaintiffs presented evidence
that supported " 'a reasonable inference of a logical
sequence of cause and effect.' " *Id.* at 87 (citation
omitted). On the basis of that evidence, a jury could
reasonably infer that nursing negligence constituted a
cause in fact of the plaintiffs' injuries. *It is reasonable to
further infer that a doctor informed of the patient's
serious postoperative problems will conform his or her
conduct to the applicable standard of care.* Speculation
and conjecture play no part in the creation of this
inference. The expert opinions, premised on actual

medical records and provided in accordance with MRE
702 and 703, afford a reasonable basis for a jury's
conclusion that the nurses' negligence was "a cause of
plaintiff's injury, and . . . that the plaintiff's injury . . .
[was] a natural and probable result of the negligent
conduct." M Civ JI 15.01. In summary, unlike the
plaintiffs in *Skinner*, who lacked any factual support for
their expert's opinion connecting the switch and the
mechanism of the decedent's death, the medical mal-
practice plaintiffs here and in *Martin* introduced evi-
dence from which the jury could reasonably infer that
earlier surgery, performed in accordance with the stan-
dard of care, would have prevented injury.[3]

IV. ADDITIONAL CONCERNS WITH JUDGE BANDSTRA'S APPROACH

Judge BANDSTRA's opinion asserts that the "logical
cause-in-fact element of plaintiff's claim can be satisfied
only by evidence showing what Eggert would, in fact,
have done had different reports been provided, without
regard whatsoever to any hypothetical obligations he
may have had under an applicable standard of care."
*Ante* at 117 n 2. But suppose that Dr. Eggert had
testified that if the nurses had notified him of changes
in plaintiff's condition, he would have immediately
taken plaintiff to the operating room. According to
Judge BANDSTRA's concurring opinion and *Martin*, Dr.
Eggert's testimony would necessarily have resulted in
summary disposition *for plaintiff* with regard to proxi-
mate causation. This result would fly in the face of the
overriding rule that a jury may elect to disbelieve Dr.
Eggert and reject his testimony for any reason, includ-
ing that it seems either self-serving or likely false.

---

[3] It bears emphasis that an expert witness's testimony may not be
admitted unless the "facts or data in the particular case upon which an
expert bases an opinion or inference [are] in evidence." MRE 703.

Alternatively, suppose that Dr. Eggert had remained a codefendant in the instant medical malpractice case. Under Judge BANDSTRA's reasoning, if Dr. Eggert had testified that he would not have operated until 8:40 p.m. notwithstanding what the nurses told him, this testimony would automatically have relieved the nurses of any liability for their negligence.

With all due respect, Judge BANDSTRA's analysis is plainly incorrect, not only because the jury has the authority to disbelieve Dr. Eggert, but also because the physician's negligence would constitute merely an intervening cause of the plaintiff's injury. This Court has soundly rejected the notion that intervening negligence eliminates proximate causation by an initial tortfeasor:

> An act of negligence does not cease to be a proximate cause of the injury because of an intervening act of negligence, if the prior negligence is still operating and the injury is not different in kind from that which would have resulted from the prior act. The courts of this state have held that whether an intervening negligent act of a third person constitutes a superseding proximate cause is a question for the jury. An intervening cause is not an absolute bar to liability if the intervening event is foreseeable, though negligent or even criminal. [*Taylor v Wyeth Laboratories, Inc*, 139 Mich App 389, 401-402; 362 NW2d 293 (1984) (citations omitted).]

"Consequences of a doctor's negligent acts in treating the plaintiff's original injury are considered foreseeable. Hence, whether the doctor's intervening negligent act constitutes a superseding proximate cause is a question for the jury." *Richards v Pierce*, 162 Mich App 308, 317; 412 NW2d 725 (1987) (citation omitted).

Judge BANDSTRA would hold, as this Court did in *Martin*, that a trial court *must* accept a physician's hypothetical description of what he would have done had he known the actual facts, even if this testimony is

soundly rebutted by competent evidence establishing that in so doing, the physician would have violated the standard of care. Such an approach elevates rank speculation over expert medical opinion. In an analogous setting involving informed consent, the United States Court of Appeals for the District of Columbia explained the reasons that courts should soundly reject this subjective standard of proof:

> In our view, this method of dealing with the issue on causation comes in second-best. *It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.* [*Canterbury v Spence*, 150 US App DC 263, 281-282; 464 F2d 772 (1972) (emphasis added; citations omitted).]

A physician's expressed opinion concerning his hypothetical conduct under different circumstances should face objective testing by a jury. Although a physician's testimony regarding causation is a relevant consideration, neither logic nor law dictates that it should always control the outcome of the causation issue.

### V. CONCLUSION

The central proximate cause question in both this case and *Martin* is whether the patient would have benefited from timely nursing reports to the attending surgeon. A jury soundly rejected Dr. Eggert's contention that he would have ignored earlier information signaling a vascular catastrophe. In a different case, a jury might fully credit a physician's comparable testimony and reject that the physician probably would have adhered to the standard of care described by the plain-

tiff's expert. Resolution of this question resides solely with the jury. In summary, with the caveats expressed in this opinion, I concur in the lead opinion's affirmance of the trial court's denial of the hospital's motion for judgment notwithstanding the verdict or a new trial, the grant of summary disposition to Dr. Eggert, and the remand for a recalculation of damages.