# STATE OF MICHIGAN

# COURT OF APPEALS

DANIEL WALKER and NANCY WALKER,

Plaintiffs-Appellees,

v

WILLIAM BEAUMONT HOSPITAL and SAID
HAFEZ KHAYYATA, M.D.,

Defendants-Appellants.

UNPUBLISHED
October 18, 2018

No. 337824
Oakland Circuit Court
LC No. 2015-145904-NH

Before: JANSEN, P.J., and METER and STEPHENS, JJ.

PER CURIAM.

In this medical-malpractice action, plaintiffs allege that defendant Said Khayyata, a pathologist at defendant William Beaumont Hospital, misdiagnosed plaintiff Daniel Walker[1] with squamous cell carcinoma after misinterpreting the results of a fine-needle aspiration (FNA[2]), causing him to undergo an unnecessary neck-dissection surgery. Defendants filed a motion for summary disposition under MCR 2.116(C)(10) (no genuine issue of material fact), arguing that plaintiffs had failed to present evidence necessary to sustain their claim because their experts presented contradicting, speculative theories of causation. The trial court denied defendants' motion, concluding that plaintiffs' experts had merely presented multiple alternative theories of causation. Although we disagree in some respects with the trial court's reasoning, we affirm its denial of defendants' motion.

In September 2012, plaintiff underwent an FNA at Beaumont to facilitate the examination of a small lump on the right side of his neck. Khayyata performed an analysis and diagnosed plaintiff with metastatic, poorly-differentiated carcinoma. As a result, it was recommended that plaintiff either undergo chemotherapy with accompanying radiation therapy or a neck-dissection procedure with accompanying radiation therapy. Plaintiff elected to engage in chemotherapy and radiation therapy first.

---

[1] Unless otherwise indicated, we use the singular word "plaintiff" to refer to plaintiff Daniel Walker.

[2] An FNA is a biopsy procedure guided by ultrasound.

-1-

In January 2013, plaintiff completed his radiation-therapy course and was given a "no evidence of disease" status. Two subsequent reexaminations and a positron-emission-tomography scan of plaintiff's body confirmed that he was recovering. However, on April 18, 2013, plaintiff underwent a second FNA, which was reviewed by Khayyata using pathology slides. The next day, Khayyata reported that the specimen examined tested positive for metastatic, squamous-cell carcinoma.[3]

On the basis of this result, plaintiff underwent a type I, comprehensive, right-neck dissection. Incidental to the procedure, a portion of plaintiff's sternocleidomastoid muscle, jugular vein, salivary gland, and lymph nodes were submitted for pathological evaluation. These structures were examined, and none of them bore any evidence of metastasis or other malignancy. No morphologic evidence of tumor cells was found.

Plaintiffs alleged that, as a result of the surgery, plaintiff suffered a pleural effusion,[4] significant weight loss (approximately 100 pounds) due to trismus[5] and odynophagia,[6] significant persisting pain, numbness and drooping of the face, inability to use more than approximately 30% functionality of his dominant arm, difficulty speaking, and an unsightly scar. These alleged ailments required him to undergo ongoing treatment and therapy, including the use of a percutaneous-endoscopic-gastronomy tube for nutrition, which came out of position and required further corrective procedures.

On March 6, 2015, plaintiffs filed this action against defendants for negligence and professional negligence. Defendants deposed two experts testifying on plaintiffs' behalf, Dr. Michael Finfer and Dr. Aaron Feliz, who presented different theories regarding how Khayyata's conduct ultimately caused Daniel's injuries. Finfer opined that the dispositive pathology slide that Khayyata reviewed had somehow become contaminated with foreign squamous cells,

---

[3] "Squamous" means "covered with or consisting of scales" or "of relating to, or being a stratified epithelium that consists at least in its outer layers of small scalelike cells." *Merriam-Webster's Collegiate Dictionary* (11th ed). A "squamous cell" is "a cell of or derived from squamous epithelium." *Id*.

[4] "Pleural" is an adjective concerning the "pleura," which is "the delicate serous membrane that lines each half of the thorax of mammals and is folded back over the surface of the lung of the same side." *Merriam-Webster's Collegiate Dictionary* (11th ed). An "effusion" is "the escape of a fluid from anatomical vessels by rupture or exudation." *Id*. A "pleural effusion," then, is a buildup of excess fluids around the lungs. WebMD, *What is a Pleural Effusion?* <https://www.webmd.com/lung/pleural-effusion-symptoms-causes-treatments#1> (accessed September 26, 2018). This required plaintiff to undergo a procedure designed to treat pleural effusion.

[5] "Trismus" is also known as lockjaw. *Merriam-Webster's Collegiate Dictionary* (11th ed).

[6] "Odynophagia" is pain that stems from swallowing food or fluids. Medicine Net, *Medical Definition of Odynophagia* <https://www.medicinenet.com/script/main/art.asp?articlekey =25604> (accessed September 26, 2018).

leading to a misdiagnosis of squamous cell carcinoma. Finfer speculated that the contaminant originated from an unknown endocervical source (i.e., from another person), though he admitted that there was no evidence to support this position. Feliz, contrastingly, submitted four alternate theories: (1) the cells identified as squamous cell carcinoma were actually macrophages, which are cells that clear away destroyed tissue; (2) the cells in question were cells that had been changed by radiation or chemotherapy; (3) non-cancerous squamous cells were carried over from the needle used during the FNA itself when it punctured the surface of plaintiff's skin and were misidentified as cancerous cells from the "source"; and (4) Khayyata's diagnosis was correct, and the FNA results did indicate the presence of metastatic squamous cell carcinoma. Feliz acknowledged the possibility that the dispositive pathology slide was contaminated. Although Feliz stated, "I don't think it's malignant," he later expressly admitted that he could not determine, within a reasonable degree of medical probability, whether any of his alternative theories was more likely than the possibility that Khayyata correctly diagnosed plaintiff with cancer.

On January 25, 2017, defendants filed a motion for summary disposition pursuant to MCR 2.116(C)(10), arguing that plaintiffs had failed to establish the element of causation necessary to sustain their claim of medical malpractice. Plaintiffs filed a response to defendants' motion, attaching an affidavit from Feliz—signed more than one month after Feliz was deposed—which indicated his opinion that "within a reasonable degree of medical certainty . . . there was insufficient evidence of malignancy to justify a pathological diagnosis of squamous cell carcinoma."

The trial court denied defendants' motion for summary disposition, reasoning that Finfer and Feliz were not directly contradicting one another such that plaintiffs had failed to establish causation. Rather, the trial court concluded that they were merely presenting alternative theories regarding how Khayyata made an incorrect diagnosis and proceeded to take inappropriate action without obtaining better information. In other words, the trial court found that both experts opined that it was more likely than not that the diagnosis of squamous cell carcinoma was erroneous.

Defendants argue that plaintiffs' experts—by their own admission—presented nothing more than mere speculation concerning potential alternative explanations for Khayyata's allegedly improper diagnosis. We agree that Feliz's testimony did not establish a genuine issue of material fact in regard to whether Khayyata caused plaintiff's injuries. However, we disagree with defendants' characterization of Finfer's testimony. Finfer has never conceded that his contamination theory was speculative. Indeed, he supported his theory with explicit reference to the April 18, 2013, FNA pathology slide that Khayyata relied on in making his diagnosis. Finfer only acknowledged that his theory about the *origin* of the contamination was speculative, not the fact of contamination itself.

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Dextrom v Wexford Co*, 287 Mich App 406, 416; 789 NW2d 211 (2010). Under MCR 2.116(C)(10), summary disposition may be granted if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." Motions for summary disposition under MCR 2.116(C)(10) test the factual sufficiency of the complaint. *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). "A question of

fact exists when reasonable minds could differ as to the conclusions to be drawn from the evidence." *Dextrom*, 287 Mich App at 416. When evaluating motions brought under subrule (C)(10), a trial court must consider—in the light most favorable to the nonmoving party—the parties' affidavits, pleadings, depositions, admissions, and other documentary evidence. *Id*. at 415-416; MCR 2.116(G)(5). Motions under subrule (C)(10) "must specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact." MCR 2.116(G)(4). The nonmoving party may not rest upon its pleading, but must set forth specific facts showing that there is a genuine issue for trial. *Id*. If the nonmoving party fails to do so, the moving party is entitled to judgment as a matter of law. *Maiden*, 461 Mich at 120. The Court may not resolve factual disputes or weigh credibility when deciding a motion for summary disposition. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994), overruled in part on other grounds by *Smith v Globe Life Ins Co*, 460 Mich 446, 455 n 2; 597 NW2d 28 (1999).

> To prevail on a claim of medical malpractice, plaintiffs must establish four elements:
>
> (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care. [*Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012).]

Defendants' motion focused on the element of proximate cause, which encompasses both cause-in-fact and legal cause.[7] See *Ykimoff v WA Foote Mem Hosp*, 285 Mich App 80, 87; 776 NW2d 114 (2009). With regard to cause-in-fact,

> [g]enerally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or "but for") that act or omission. While a plaintiff need not prove that an act or omission was the *sole* catalyst for his injuries, he must introduce evidence permitting the jury to conclude that the act or omission was *a* cause. [*Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 87; 684 NW2d 296 (2004) (citations omitted).]

"On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Skinner*, 445 Mich at 163. An analysis of legal cause examines whether the harm caused to a plaintiff was of the general kind that the defendant risked with his or her

---

[7] There has been some confusion stemming from a history of using the term " 'proximate cause' both as a broader term referring to factual causation and legal causation together and as a narrower term referring only to legal causation. All this broader characterization recognizes, however, is that 'a court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries.' " *Ray v Swager*, 501 Mich 52, 63-64; 903 NW2d 366 (2017) (citations omitted).

negligent behavior. *Ray v Swager*, 501 Mich 52, 64; 903 NW2d 366 (2017). A court must determine that a plaintiff has established factual causation before legal causation becomes a relevant issue. *Id*.

We turn first to Finfer's testimony. If circumstantial evidence is relied on to establish causation, the evidence presented must lead to a reasonable inference of causation, not mere speculation. See *Ykimoff*, 285 Mich App at 87. Speculative arguments are insufficient as a matter of law to establish genuine issues of material fact. *Latham v Nat'l Car Rental Sys, Inc*, 239 Mich App 330, 336; 608 NW2d 66 (2000). The *Ykimoff* Court provided guidance regarding what constitutes speculation and conjecture:

> As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence. [*Ykimoff*, 285 Mich App at 88 (quotation marks and citations omitted).]

Finfer theorized that Khayyata misdiagnosed plaintiff with squamous cell carcinoma because the April 18, 2013, pathology slide used by Khayyata to make his diagnosis was contaminated with atypical squamous cells from an endocervical source. Since this action was filed, Finfer has consistently maintained his belief that Khayyata breached the applicable standard of care owed to plaintiff by failing to avoid contamination of the FNA slide and by failing to distinguish between contaminants and "clinically significant findings." He has never wavered in his belief that Khayyata's diagnosis was the result of improper contamination.

The only point on which Finfer speculated concerned the *origin* of the atypical squamous cells. Finfer admitted that, while he believed the atypical squamous cells depicted in the pathology slide came from an endocervical source, he had no way to be certain. However, his theory that the squamous cells—regardless of their origin—contaminated the results of the FNA resulting in an improper misdiagnosis and needless surgery was not without the requisite support from the evidence. See *id*.

Finfer supported his theory with references to the slide. He stated that all of the alleged squamous cells in the pathology slide should have been contained within an area of the slide pictures called the "cell block." Indeed, Finfer testified that "the cells need to be in the cell block to be sure they belong with the case." However, the squamous cells depicted in the slide pictures mostly fell *outside* the cell block. Some were so far from the cell block that they could not be contained within one picture. Finfer's testimony about the slide was circumstantial evidence of contamination. Although Finfer appears to have admitted that it was possible for atypical squamous cells to have been present in the cell block without being "picked up in the surgical pathology studies," he believed that such circumstances were "highly unlikely." To proceed beyond summary disposition, plaintiffs were not required to prove with absolute certainty that Finfer's theory was the only possible explanation for Khayyata's alleged breach of care. See *id*.

-5-

Instead, plaintiffs merely needed to demonstrate that the evidence was selectively applicable to Finfer's theory. See *id*. Viewed in the light most favorable to plaintiffs, the facts established by Finfer's testimony are selectively applicable to the possibility that Khayyata improperly identified some foreign contaminant as squamous cell carcinoma, leading to plaintiff's injuries. See *id*.; see also *Dextrom*, 287 Mich App at 416.

Feliz's deposition testimony, however, failed to exclude with a fair amount of certainty the possibility that Khayyata did not misdiagnose plaintiff. See *Ykimoff*, 285 Mich App at 87. Feliz's affidavit does not detract from this analysis. Indeed, "parties may not contrive factual issues merely by asserting the contrary in an affidavit after having given damaging testimony in a deposition." *Dykes v William Beaumont Hosp*, 246 Mich App 471, 480; 633 NW2d 440 (2001) (quotation marks and citation omitted).

However, the fact that plaintiffs' experts offered diverging testimony regarding possible theories of causation is of no consequence. See *Ykimoff*, 285 Mich App at 88. As previously discussed, there may be more than one plausible explanation concerning how an event occurred. See *id*. What matters is whether the evidence is selectively applicable to at least one of the offered explanations, "notwithstanding the existence of other plausible theories with or without support in the evidence." *Id*. (quotation marks and citations omitted). Accordingly, because the evidence presented was selectively applicable to Finfer's theory that Khayyata failed to identify contaminants in the FNA results that ultimately led plaintiff to engage in unnecessary and injurious surgery, the theory amounts to more than mere speculation. See *Ykimoff*, 285 Mich App at 88. Plaintiffs have established a genuine issue of material fact sufficient to proceed beyond summary disposition. See MCR 2.116(C)(10).

Affirmed.

/s/ Patrick M. Meter
/s/ Cynthia Diane Stephens